In the Matter of THEODORE DEUTSCHMANN et al., Respondents, and MILTON PAULSON et al., Appellants-Respondents. AMERICAN TELEPHONE AND TELEGRAPH COMPANY, Respondent-Appellant.

First Department, November 12, 1952.

16

*S. Hazard Gillespie, Jr.,* of counsel (*James A. Farmer, Pierce W. Gaines, Walter Pond* and *Henry L. King* with him on the brief; *Davis Polk Wardwell Sunderland & Kiendl,* attorneys), for American Telephone and Telegraph Company, respondent-appellant.

*Milton Paulson,* appellant-respondent in person.

*Jay Leo Rothschild* of counsel (*Sidney L. Garwin,* attorney), for Michael Cohen and others, and Sidney Goldblatt and another, trustees, appellants-respondents.

*Jay Leo Rothschild* of counsel (*William Rosenfeld,* for Theodore Deutschmann and others; *Glickman & Levinkind* for Rose Bennett; *Morton Frederick* for Edward L. Finn and others; *Sidney L. Garwin* for Michael Cohen and others), for respondents.

*Earl I. Gallant* of counsel (*Leon Himmelfarbe,* attorney), for Postgal Realty Corp., respondent.

*Charles Howard Levitt* of counsel for Samuel Schack, respondent.

*Lawrence B. Simons* of counsel (*Spring & Eastman,* attorneys), for Louise L. Eastman, respondent.

VAN VOORHIS, J. This appeal involves the construction of section 1 of chapter 647 of the Laws of 1950, amending section 21 of the Stock Corporation Law. It concerns whether interest is to be paid upon the awards to dissenting stockholders, and whether costs and expenses of the appraisal proceeding should be assessed against the corporation. Appellant American Telephone & Telegraph Company (hereinafter called "AT&T") contends that the action of these dissenting stockholders in declining to accept the offer of the corporation was arbitrary and vexatious or not in good faith, and that, therefore, such costs and expenses should not be assessed against the corporation, but be left to be borne by the petitioning stockholders personally. For the same reason, appellant contends that Special Term also erred in directing that interest be paid upon the amount awarded.

Section 21 of the Stock Corporation Law, as amended in 1950, provides in part (subd. 4) that "Any judgment for the value of stock entered under this subdivision shall include interest from the date of the stockholders' vote on the action to which objection was made; provided, that if, taking into consideration the price which the corporation may have offered to pay for such

stock, the financial statements furnished to the stockholder, and such other circumstances as the court may deem relevant, the court shall find that the action of the stockholder in failing to accept such offer was arbitrary and vexatious or not in good faith, no interest shall be allowed." Somewhat different phraseology regulates the imposition of costs and expenses. The clause regarding that states (subd. 5): " The costs and expenses of the proceeding shall be determined by the court and shall be assessed against the corporation; provided, that all or any part of such costs and expenses may be apportioned and assessed as the court may deem equitable against any or all of the objecting stockholder parties to the proceeding to whom the corporation shall have made an offer to pay for the stock if, taking into consideration the value of the stock as determined in the proceeding, the financial statements furnished to such stockholders, and such other circumstances as the court may deem relevant, the court shall find that the action of such stockholders in failing to accept such offer was arbitrary and vexatious or not in good faith."

Under this statutory program, disallowance of interest is mandatory where refusal to accept the corporation's offer has been arbitrary and vexatious or not in good faith. Upon the other hand, even where that is so, assessment of items of costs and expenses of the proceeding specified in the statute against the corporation, is discretionary with the court. The statute is correctly construed in this manner in appellant's reply brief.

In this case the offers made by AT&T to dissenting stockholders were at a price per share fractionally above the figure at which the stock sold on the exchanges on the day next preceding the date of the stockholders' meeting, viz., on November 14, 1950. Financial statements of AT&T were furnished and the other requirements of this statute were met. After twenty-five hearings, at which more than 2,000 pages of testimony were taken plus the admission of 288 exhibits, the appraiser, appointed by the court, found the value of the stock upon the appraisal date to have been the market price originally offered by the corporation, to wit: $152 a share. The appraiser's report was confirmed. No appeal was taken from the portion of the judgment fixing the value of the stock. AT&T appeals insofar as it directs payment to dissenting stockholders of $26,106.58 interest upon the amounts awarded, and assesses against the corporation $35,469.22 for the services and expenses of the appraiser in the proceeding, and a balance of $3,010.50 for

stenographic services at the twenty-five hearings and in transcribing the testimony.

Prior to the commencement of these proceedings, and before the stockholders' resolution was passed to which objection was taken, the law concerning the valuation of stock in appraisal proceedings was reviewed and summarized in an opinion written by Presiding Justice PECK in *Matter of Marcus (Macy & Co.)* (273 App. Div. 725, 727, affd. without opinion in 303 N. Y. 711). This court there said: "The briefs remind us of the various factors enumerated in the decisions which should be taken into consideration in determining the value of stock. All of the decisions emphasize, however, that it is the facts of the particular case which determine the factors to be considered and the weight to be given them, and that market value is the controlling consideration where there is a free and open market and the volume of transactions and conditions make the market a fair reflection of the judgment of the buying and selling public."

It followed that if the market price at which this stock was traded upon the appraisal date on the New York Stock Exchange, and on the five other exchanges where it was listed, fairly reflected the judgment of the buying and selling public, the dissenting stockholders were not justified in assuming that their shares could be appraised at any higher value. This was not a closely held security. On the appraisal date, there were 950,000 shareholders of AT&T, of whom 900,000 held less than 100 shares apiece, and no single holder owned as much as half of 1% of the outstanding shares. It was traded in larger dollar volume than the shares of any other stock listed on the New York Stock Exchange.

There is no evidence that the proposal on September 20, 1950 by the directors of the portion of the plan to which these stockholders objected, had any measurable effect upon the market. This proposal contemplated an issue of 3,000,000 shares, to be available only to employees of AT&T at $20 below the average market price, but in no event to be at more than $150 nor at less than $100 per share. Although the market did drop three or four points when the plan was announced, this was apparently due to the proposal simultaneously made to authorize a new issue of convertible debentures not exceeding $435,000,000. There is no contention that the authorization by the stockholders of this issue of convertible debentures could confer any right upon respondents to demand payment for their shares, nor were the

objections and demands which they did make placed upon that basis. Their objections were confined to the issuance of the 3,000,000 shares under the " Proposed Employees' Stock Plan ". The disposal of these shares at $20 below the average market price would have been unlikely to affect the market more than it would have been affected by a corresponding increase in the remuneration of these employees in some other manner. Plaintiffs' expert witness testified that market prices were depressed by the existence of convertible debentures, but said nothing about any decline due to the issuance of these 3,000,000 shares to employees or the proposal thereof. There is no basis in the record for a conclusion, nor was there any reasonable ground for belief, that the proposal to issue these shares to employees did nor would materially affect the market. Such a contention is not seriously urged in respondents' briefs upon this appeal.

The only reason of moment which has been advanced to support the contention that the market did not fairly reflect the value of AT&T stock on the appraisal date, is that arbitrage transactions had been conducted on a large scale over a considerable period of time. These transactions are said to have impaired the freedom of the market; and to have depressed it below a figure that would otherwise have constituted a fair reflection of the judgment of the buying and selling public. This point is simply and effectively answered in the appraiser's report, by pointing out that arbitrage sales of stock are made possible only by the voluntary decisions of the owners of convertible debentures to sell those securities. Arbitrage transactions, of this nature, consist in the purchase of convertible debentures simultaneously with the sale of the same number of shares of stock into which they are convertible. The profit of the arbitrageurs is derived from a slight difference between the selling price of the stock and the purchase price of the bonds. The effect upon the market was the same as though any bondholders had decided to convert their bonds and sell the resulting stock. These bonds, at the date in question, were selling above par at a figure determined by the value of the stock, except that there was customarily a slight lag in changes in market price of the bonds following changes in the market price of the stock. Otherwise, arbitrage transactions with respect to them would not have been possible. Similar factors were in operation affecting the market price of convertible bonds as in the case of purchases and sales of stocks. Although the shares into which such bonds would be converted may not

have been issued and outstanding until after conversion, they had previously been authorized and overhung the market, regardless of when bondholders decided to exercise their conversion privileges. Financing by means of convertible bonds had become an established policy of AT&T, and was at all times a generally known factor in the market. The freedom of the market was not thereby impaired. These matters were sufficiently basic to have been understood by stockholders, including petitioners, without the necessity for taking 2,000 pages of testimony at twenty-five different hearings.

A somewhat more serious consideration might be whether the proposal to issue $435,000,000 of convertible debentures announced September 20, 1950, could have destroyed the freedom of the market as an index of value on the appraisal date, November 14, 1950. It may be assumed that the market for AT&T shares declined from three to four points as a result of this announcement. Nevertheless, it was not the authorization of these debentures which entitled petitioners to have their shares appraised and bought by the corporation. It may be that an issue of a proportionately large amount of unissued stock just before the appraisal date, otherwise than in the regular course of business, might create an artificially depressed market that would not reflect prices which would normally be agreed upon between willing buyers and sellers not compelled to buy or sell. Upon the other hand, where a corporation needs additional funds for its regular business, and it resorts to methods of financing which it has been accustomed to employ, no artificial market condition is created. Especially is that true where, as here, the new public issue was not of stock but of bonds, which could be converted over a period of years. The investing public may not have known how much additional funds would be required until this proposal to authorize $435,000,000 of convertible debentures was announced, but petitioners could hardly have believed themselves to be entitled to a vested interest in ignorance concerning facts affecting the corporation. There was no reason to believe, nor has the fact been shown to be, that the proceeds of such of these debentures as might be issued and sold would not be required in the ordinary course of business, nor that the market was or could have been affected by their authorization in other than a normal manner.

Much space has been devoted in petitioners' briefs to contentions that AT&T had a net asset value of $225 a share, based upon its estimates submitted to various regulatory bodies for

rate-making purposes, and that its prospects were sufficiently bright so that its stock might have been expected to rise. Suffice it to say that there was no reason for petitioners to believe that these considerations, as well as other factors both adverse and favorable, were not reflected in the market. The bases for optimism and pessimism on the part of investors, and their reactions thereto, cause some to buy and others to sell. That is what creates a market, and the market measures the value where, as here, it is free and open.

By employing the words "arbitrary and vexatious or not in good faith" in the 1950 amendment to section 21 of the Stock Corporation Law, the Legislature appears to have had in mind that appraisal proceedings are sometimes instituted for reasons similar to those which occasionally have led to the commencement of minority stockholders' actions, as described in the following language from *Lapchak* v. *Baker* (298 N. Y. 89, 94–95, LOUGHRAN, Ch. J.):

"In giving his executive approval to section 61-b [of the General Corporation Law], the Governor of the State issued a memorandum [Public Papers of Governor Dewey (1944), p. 255] in which he made the following commentary upon stockholders' derivative actions: ' In recent years a veritable racket of baseless lawsuits accompanied by many unethical practices has grown up in this field. Worse yet, many suits that were well based have been brought, not in the interest of the corporation or its stockholders, but in order to obtain money for particular individuals who had no interest in the corporation or in its stockholders. Secret settlements — really pay-offs for silence — have been the subjects of common suspicion.' The existence of some of these evils is here conceded."

It would be unfortunate, indeed, if statutes such as these were to obstruct the commencement of stockholders' derivative actions or of appraisal proceedings in bona fide cases, nor can the intention have been to lay burdens upon all plaintiffs or petitioners whose efforts in these directions are not crowned with success. "Arbitrary and vexatious or not in good faith" are words that are used to characterize appraisal proceedings that are begun without reasonable cause to believe that there can be a greater recovery than the amount offered by the corporation. Under the circumstances here disclosed, we are satisfied that reasonable men could not reasonably have differed concerning the fact that the standard of value of AT&T stock on November 14, 1950, for the purpose of appraisal proceedings,

was what it sold for upon the six stock exchanges on which it was listed in the United States. The institution of these appraisal proceedings by stockholders who had refused offers of $152 per share was at least "arbitrary and vexatious" within the meaning of this law.

From this it follows that the order and judgment appealed from should be modified by eliminating the recovery of interest by such stockholders upon their awards. A statute is not invalid which says that interest need not be paid during an interval when a dissenting stockholder would have had the use of his money, if he had not arbitrarily and vexatiously refused to accept it when it was offered to him. Disallowance of interest is mandatory in the case of stockholders who have received and refused such an offer arbitrarily and vexatiously or in bad faith.

Upon the other hand, as appellant concedes, the statute does not precisely state that the costs shall be borne by the unsuccessful petitioners in every instance where it is found that the proceedings were instituted under such circumstances. A reference is requested by appellant to determine the degree of vexatiousness or bad faith to be ascribed to petitioners respectively, with a view to the apportionment accordingly of allowable items of costs and expenses among them. It is, of course, axiomatic that external standards and objective tests are to be applied in the administration of justice wherever possible. In general, it can be stated that such costs and expenses should not be imposed upon the corporation wherever it appears that petitioners have instituted appraisal proceedings without some reasonable cause to believe that they can result in larger awards than the company has offered. At the time when this proceeding was begun, however, there had been no court decisions formulating rules to be applied as a guide to discretion in regard to the assessment of costs, where the institution of the proceeding has been arbitrary and vexatious or in bad faith. Ordinarily, where those facts are found, costs of an action or special proceeding would be imposed as a matter of course, upon the parties chargeable with such behavior. This statute is peculiar, however, in providing that this shall not be done, even in such circumstances, except in the court's discretion. Although we think that hereafter, where the conduct of dissenting stockholders has been arbitrary and vexatious or in bad faith, the discretion of the court should be exercised in favor of imposing allowable items of costs and expenses upon such stockholders personally, even without a showing of more aggravated conduct

than the institution of appraisal proceedings without reasonable cause to believe that a larger sum can be obtained, we are unable to conclude that this should be done in these proceedings, which were begun before there were any decisions of the courts construing this particular portion of this statute. Petitioners are chargeable with having known that the usual standards would be applied in determining whether their conduct was arbitrary and vexatious or in bad faith, and that if they acted without reasonable cause to believe that they might succeed, they would be subject to whatever disability or liability the statute visited upon them in that event. They must have been considerably in the dark, however, concerning what liability for costs and expenses, if any, they would incur if they did act without reasonable cause to believe that they could obtain more than the company had offered. In the absence of any previous controlling precedent respecting this latter matter, we think that in the present case a wise exercise of discretion dictates that these costs and expenses should be borne by the corporation. But if the principle which is now announced had been embodied in some earlier decision, that these items of costs and expenses should be assessed against objecting stockholders wherever their refusal to accept the company's offer has been arbitrary and vexatious or in bad faith, that would have been a circumstance which would have entered into the exercise of the discretion of the court, and might well have resulted in imposing payment of these items upon petitioners personally who had failed to accept the offers made.

Several other questions remain to be considered which are not common to all of the petitioners. Some of the petitioners had not yet become holders of record of their shares, which remained in the names of stock exchange firms that had bought them for such petitioners' accounts. Petitioners in that category sought to withdraw from the proceedings, after the appraiser's report went against them. It was enough to enable them to prosecute the proceedings that they were the beneficial owners of the shares (*Matter of Rowe,* 107 Misc. 549; *Matter of Bacon* [*Susquehanna Silk Mills*], 287 N. Y. 1; *Matter of Standard Coated Products Corp.* [*Bazar*], 183 Misc. 736, affd. without opinion 271 App. Div. 1007). Their applications to withdraw were properly denied.

It happens that in the cases of several of these last-mentioned stockholders, however, offers by the company were not made to purchase their shares as required by section 21 of the Stock

Corporation Law. The reason on account of which such offers were not made is immaterial. The statute suspends payment of interest, and authorizes assessment of costs and expenses against a stockholder, only if his failure to accept the company's offer has been arbitrary and vexatious or in bad faith. There cannot have been a failure to accept an offer which has not been made. Offers were not made to petitioners Milton Paulson, Michael Cohen and Irving M. Ames, or to Raymond A. Ochacher, Sidney Goldblatt and Howard Schwab as trustees for William Schwab. Interest upon their awards must be paid. It is true that a stock certificate was subsequently issued to Cohen and Ames, and that appellant demanded that their attorney sign a stipulation, as a condition of issuing the certificate, that " a written offer to pay for such stock in cash at the price of $152 per share is deemed to have been made to the said Irving M. Ames and Michael Cohen within the time and as prescribed by section 21 of the New York Stock Corporation ". Nevertheless, although the attorney did sign such a stipulation, appellant had no right to require it, and it could not take the place of the actual making of the offer which the statute required. Cohen and Ames cannot be held to have refused, arbitrarily and vexatiously, an offer which in fact was never made.

The order and judgment appealed from should be modified by striking out the directions for the payment of interest upon the awards to all of the petitioners except Paulson, Cohen and Ames, and the trustees for William Schwab, and, as so modified, should be affirmed, with costs of the appeal against all of petitioners except those just named. New findings should be made in accordance with this opinion, and contrary findings should be reversed. Settle order.

COHN, J. (dissenting). The contention of appellant seems to be that in a case such as this where a corporate stock is listed on leading national security exchanges and is actively and freely traded, the current market price should be conclusive evidence of value, regardless of other circumstances, and if this market price coincides with the value fixed by the appraiser and the court, interest must be disallowed, and the court should order an apportionment and assessment of the appraisal costs among respondents. The statute does not so provide.

Market value is, of course, an important factor to be considered where the stock is listed on the stock exchange and freely traded, but that is by no means a conclusive factor. Investment value and net asset value are also to be weighed

in the appraisal process. (*Matter of Fulton,* 257 N. Y. 487, 492–495; *Matter of Marcus* [*Macy & Co.*], 273 App. Div. 725; *Matter of Behrens,* 61 N. Y. S. 2d 179, affd. 271 App. Div. 1007.)

Here the appraisal proceeding lasted over three months. Thousands of pages of testimony were taken and there were hundreds of exhibits, many of which had been offered by appellant. It would be extremely difficult to recite all the evidence offered pro and con on the question of value. Apparently, market value, investment value and net asset value were considered by the appraiser. He properly received proof of many factors to be regarded in establishing investment value of the stock. Among these were: the rate of return on the stock, the probability that the dividends would be regularly paid, prospect of increase in dividends, selling price of stocks of like character, size of accumulated surplus applicable to the payment of dividends; the record of the corporation and its prospects for the future (*Matter of Fulton,* 257 N. Y. 487, 495, *supra*).

Far from finding that respondents had been arbitrary and vexatious, and had not acted in good faith, or that their arguments were not based upon reasonable grounds, the appraiser obviously considered the matter of value to be unusually complex. He also stated that the concept of net asset value as break-up value admittedly posed a perplexing problem; that respondents " presented persuasive arguments in support of their contention " and " that the proof had raised a variety of serious questions with respect to almost every phase of the appraisal."

In his affidavit, the appraiser, who had full opportunity to evaluate the testimony of objecting stockholders, observed that they were able to offer a formidable body of documentary proof as well as opinion evidence to support their claim that the investment value of the stock was the amount they sought, namely: $225 per share. Indeed during the course of appraisal proceedings the stock in the open market had risen to $163.

The Special Term was justified in finding that appellant had failed to maintain its burden of showing that the objectors acted arbitrarily and vexatiously or that they were not acting in good faith. To constitute bad faith some improper motive is essential. (*Hearst* v. *McClellan,* 102 App. Div. 336.) Mistake of judgment is not bad faith. (*Lonsdale* v. *Speyer,* 174 Misc. 532, 542, 543, affd. 259 App. Div. 802, affd. 284 N. Y. 756.) In *Paramount Pictures* v. *Blumenthal* (256 App. Div. 756, 760, appeal dismissed 281 N. Y. 682) this court made the following

pertinent observation as to so-called vexatious litigation: "It may be argued that most litigations are vexatious and annoying. In order, however, that litigation may be legally termed vexatious it must be shown that it is instituted maliciously and without probable cause. (*Calvo* v. *Bartolotta*, 112 Conn. 396 * * *.)"

A finding that as a matter of law upon the record in this case the dissenting stockholders were arbitrary and vexatious or that they did not act in good faith, is not warranted.

The order of the Special Term should in all respects be affirmed.

DORE, J. P., CALLAHAN and BREITEL, JJ., concur with VAN VOORHIS, J.; COHN, J., dissents and votes to affirm, in opinion.

Order and judgment modified by striking out the directions for the payment of interest upon the awards to all of the petitioners except Paulson, Cohen and Ames, and the trustees for William Schwab and, as so modified, affirmed, with costs of the appeal against all of the petitioners except those just named. New findings of fact are to be made in accordance with the opinion herein and contrary findings reversed. Settle order on notice.