**SEABOARD WORLD AIRLINES, INC.,**
Plaintiff-Appellee,

v.

**TIGER INTERNATIONAL, INC.,**
Defendant-Appellant.

**No. 874, Docket 79–7104.**

United States Court of Appeals,
Second Circuit.

Argued March 8, 1979.

Decided May 18, 1979.

Henry G. Bisgaier, New York City (Cahill Gordon & Reindel, W. Leslie Duffy, Robert C. Meade, Jr., Thomas W. Pippert and Peter Leight, New York City, of counsel), for plaintiff-appellee.

Paul J. Bschorr, New York City (White & Case, Peter M. Collins, Richard W. Reinthaler, Diane Dimond and James P. Laughlin, New York City, of counsel), for defendant-appellant.

Before SMITH, MANSFIELD and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

Tiger International, Inc. (Tiger) is the holding company of a subsidiary, The Flying Tiger Line, Inc., (Flying Tiger) which is the nation's largest all-cargo air carrier, maintaining routes throughout the United States and across the Pacific Ocean. Tiger is a Delaware Corporation with its principal place of business in Los Angeles, California. Seaboard World Airlines, Inc. (Seaboard) is the nation's second largest all-cargo airline and the leading air-cargo carrier over the North Atlantic. Seaboard is a Delaware Corporation with its principal place of business at John F. Kennedy International Airport, Jamaica, New York.

In January and February of 1978, Tiger acquired some 600,000 shares (slightly less than 10%) of the common stock of Seaboard through purchases on the open market at an average price of $6.47 per share. In accordance with the provisions of the Williams Act, 15 U.S.C. § 78m et seq., when Tiger had purchased 5% of the Seaboard stock it filed a Schedule 13D Statement, 17 C.F.R. § 240.13d–101, dated February 16, 1978 which, *inter alia*, recited its willingness to explore with Seaboard the possibility of a merger or other business combination. Tiger further represented that it had no present plans, were it to gain control of Seaboard, to liquidate that company or to sell its assets.

A meeting was held on March 9, 1978 between the principal executives of the two companies. During follow-up negotiations Seaboard suggested that a starting point for discussion of a business combination would be an offer of approximately $120 million dollars—$20 per share—based upon Seaboard's pre-tax asset liquidation value.

The response of Tiger's chief executive by letter dated March 16, 1978 was as follows:

During our meeting on March 9th you indicated that your Board of Directors would like to have a price from us. In our telephone conversation on March 13th you indicated that a starting point for discussions would be approximately $120 million, based upon Seaboard's stated book value of $57 million plus the value of aircraft and other items not reflected on the balance sheet. Applying the same type of analysis to our own company would produce a theoretical value of over $1.028 billion, more than four and one-half times the total market value of our shares. (Such a value is comprised of a book value of $261 million, $530 million for added value of railcars and $237 million for aircraft.) We do not regard such a figure as a useful valuation of our own business, and we are not in a position to assay the value of Seaboard on such a basis.

Following these abortive discussions, on April 19, 1978 Tiger amended item 4 of its Schedule 13D form to provide in part: "Tiger regards Seaboard's suggested price [$20 per share] as unrealistic and notes that Seaboard stock traded at $4 a share as recently as December 1977, before Tiger purchased its 9.9% interest."

In October, 1978, Tiger acquired an additional 362,200 shares of Seaboard on the open market at an average price of $14 per share, thereby increasing its ownership to about 15.6% of the total shares outstanding. Since both Seaboard and Flying Tiger are certificated air carriers, approval by the Civil Aeronautics Board (CAB) of the acquisition of over 10% of Seaboard's stock (a percentage giving Tiger presumptive control of Seaboard under the Federal Aviation Act, 49 U.S.C. § 1378(f)) was required. To help gain CAB approval of this purchase as well as Tiger's proposed future purchases of up to 25% of Seaboard's shares, Tiger had deposited in a blind trust with the Bank of California, N.A. all the Seaboard shares it had acquired on the open market. Before the CAB, Seaboard contended that Tiger had violated sections 408 and 411 of the Federal Aviation Act, 49 U.S.C. §§ 1378(f), 1381, by acquiring presumptive control of Seaboard prior to Board approval. Seaboard also charged a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, because such control might substantially lessen competition, tend to create a monopoly and constitute an act of unfair competition.

On December 14, 1978 the CAB issued an order (No. 78–12–173) in which it determined that pending a final decision on the application Tiger could purchase up to 25% of the Seaboard shares, to be held in the blind trust pursuant to agreement with the Bank of California, N.A.[1] The presumption of control predicated upon ownership of 10% of the stock, 49 U.S.C. § 1378(f), was found rebutted by the use of the voting trust. The CAB order further indicated that any decision on the merits would be premature. "No party has convincingly demonstrated that mere ownership of this particular amount of stock [25%] would irreparably harm Seaboard or endanger the public interest in the orderly adjudication of the underlying competitive issues in this case." Order No. 78–12–173 at 8. The CAB instituted a proceeding to investigate the allegations raised by Seaboard, especially the competitive significance of the proposed acquisition. This proceeding is still pending. Seaboard's petition for a stay of the order of the CAB was denied by the United States Court of Appeals for the District of Columbia Circuit on January 12, 1979.

On January 18, 1979 Tiger made its tender offer to purchase for cash 638,000 shares of Seaboard common stock or about 9.4% of the total outstanding. Together with those shares already acquired on the open market a successful offer would raise Tiger's holdings of Seaboard common to the maximum 25% permitted by the CAB order. The offer was at the price of $12.30 per share.[2] Initially scheduled to expire on

1. This order vacated an initial CAB ruling rendered in October, 1978 which denied Tiger's application for permission to own up to 25% of Seaboard's outstanding common stock.

2. Since Seaboard had announced a 10% common stock dividend and a 10% per share cash dividend payable to stockholders of record on January 31, 1979, tendering stockholders were

February 8, 1979, the offer was later extended to February 15 and, ultimately, to March 12, 1979.

## A. *Prior Proceedings*

On February 7, 1979 Seaboard filed its complaint in the United States District Court, Southern District of New York, alleging that Tiger's offer to purchase contained untrue statements of material facts in violation of section 14(e) of the Williams Act, 15 U.S.C. § 78n(e), section 10(b) of the Securities Exchange Act,[3] and the rules and regulations promulgated thereunder. Specifically Seaboard argued that paragraph 12 of the offer was materially misleading in that it failed to disclose the "enormous true value" placed upon the Seaboard stock by Tiger. Paragraph 12 of the tender offer recited Tiger's prior statement made in item 4 of its amended Schedule 13D, filed with the Securities and Exchange Commission on April 19, 1978, that Seaboard's suggested price of $20 per share was "unrealistic." Also in that paragraph Tiger noted that Seaboard's stock traded at $4 per share as recently as December 1977.[4] The Seaboard complaint alleged that its stock was of "unique and high value," particularly because its DC–8F and Boeing 747 jet freighter aircraft were in high demand, and

were both enormously costly and difficult to obtain. Tiger was charged in the complaint with knowledge of the increased value of Seaboard's stock by reason of the growth of Seaboard's business and the company's profitability, reflected in its recent dividends. The complaint concluded that in view of this Tiger was attempting to acquire Seaboard at an unfairly low price. Seaboard sought preliminary and permanent injunctive relief against Tiger's acquisition of any common shares of stock until Tiger had made "full disclosure of material information to the shareholders of Seaboard."

Seaboard further sought a temporary restraining order preventing Tiger from proceeding with its tender offer, and expedited discovery of certain documents filed by Tiger in the proceedings before the CAB. On February 7, 1979, Judge Motley denied the temporary restraining order because Seaboard had failed to show irreparable harm and denied the application for expedited discovery on the ground that the plaintiff had not shown any need for the documents. On February 8, 1979 this court dismissed for lack of appellate jurisdiction Seaboard's appeal from the denial of its motions for discovery and a temporary restraining or-

---

to receive such dividends whenever they tendered. The price of $12.30 per share was equivalent to $13.53 per share before giving effect to the stock dividend.

**3.** We have noted that in effect section 14(e) applies the strictures of Rule 10b–5 to the offeror and opposition in a tender offer. *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 940–41 (2d Cir. 1969); accord, e.g., E. Aranow & H. Einhorn, Tender Offers for Corporate Control 116–17 (1973) (hereinafter Tender Offers); 2A Bromberg, Securities Law § 6.3 (212) at 116.7–8 (1977); Brown, The Scope of the Williams Act and its 1970 Amendments, 26 Bus. Law. 1637, 1646 (1971). Therefore our discussion throughout the remainder of this opinion on the merits of Seaboard's section 14(e) claim is dispositive also of its section 10(b) claim.

**4.** The relevant portion of paragraph 12 of Tiger's tender offer reads as follows:

After acquiring 600,000 shares of Common Stock in January and February, 1978 (at an

average price per share, exclusive of 5% per share commissions, of $6.47, approximately $5.88 after adjustment for the 10% Common Stock dividend), Tiger expressed its preparedness to explore with the management of Seaboard the possibility of a merger or other business combination of Seaboard and Tiger. In April, 1978, Seaboard management advised Tiger that there was no need, from the point of view of Seaboard or its stockholders, for a merger between Seaboard and Tiger. Seaboard management indicated that its directors would consider a merger only if Seaboard's other stockholders will receive value of the order of magnitude of $20 (approximately $18.18 as so adjusted) per share. Tiger regarded Seaboard's suggested price as unrealistic (the Common Stock had traded at $4, about $3.64 as so adjusted, per share in December, 1977, before Tiger commenced its purchases, see section 9).

der. The parties were directed to return to Judge Motley for an immediate hearing on the application for preliminary injunctive relief. On the afternoon of February 8, Judge Motley instructed Tiger to produce documents filed with the CAB and these were produced early that evening. The preliminary injunction hearing was held on February 9.

At that hearing Seaboard produced two witnesses, including its senior vice president, Samuel Fondiler. Fondiler testified that the liquidation value of Seaboard's assets had been estimated by him to be $20 per share in March, 1978. Two principal factors accounted for this valuation. First, according to Fondiler's calculations Seaboard's Boeing 747 and DC–8F aircraft were then worth $30 million more than the amount listed on Seaboard's books. Second, the witness estimated that additional aircraft leased by Seaboard were worth $30 million above their long-term fixed rental. Fondiler also testified over objection to his interpretation of some of the documents discovered in the CAB hearing which indicated that Tiger had been made aware of the value of the Seaboard aircraft.

Tiger conceded that the liquidation value of Seaboard's assets did approximate $20 a share but argued below and on this appeal that such a valuation is not a useful norm for the purpose of merger or acquisition discussions where the merged or acquired company is to be maintained as a going concern. Tiger introduced three documents into evidence. The most pertinent was the above-mentioned March 16, 1978 letter from the President and Chairman of Tiger to the President and Chairman of Seaboard indicating Tiger's reaction to the $20 per share valuation. Tiger produced no witnesses, did not request time to obtain any, and rested.

In the oral opinion given by Judge Motley on February 9 the District Judge found that Seaboard had made a clear showing of (1) probable success on the merits and possible irreparable injury to itself and its stockholders, and (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward Seaboard and its stockholders. A preliminary injunction was issued pending a full trial on the merits which was scheduled to commence March 14, 1979. On February 13 the district court denied Tiger's motion to vacate the preliminary injunction or, in the alternative, to reopen the hearing. This appeal followed and was argued on March 8, 1979. Since time was of the essence and both parties wished a speedy determination on the merits this court on March 9, 1979 entered an order dissolving the preliminary injunction as improvidently granted. Judge Mansfield dissented. The order indicated that a formal opinion would follow.[5]

### B.  *The Issues on Appeal*

The question before us is whether the district court properly issued preliminary injunctive relief banning Tiger from purchasing Seaboard common stock pursuant to its tender offer of January 18, 1979. The complaint in substance charged that paragraph 12 of the tender offer violated section 14(e) of the Williams Act. Preliminary injunctive relief in this Circuit calls for a showing of "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy Inc. v.*

---

5. Subsequent to our March 9 order Tiger proceeded to consummate its tender offer by purchasing and paying for the approximately 373,000 shares previously tendered. As a result of an extension of the offer through March 12, 1979 Tiger made additional purchases of some 222,000 shares. The total of approximately 595,000 shares purchased brings Tiger's present holdings to 24.4% of Seaboard's outstanding common stock.

No further proceedings have transpired in the district court. At the request of the parties the district court has postponed the trial to await this court's opinion. The parties are currently involved in discovery related to the proceeding before the CAB. An evidentiary hearing therein is set for early June and a final CAB decision is not expected until later this year.

*H. P. Hood & Sons, Inc.*, 596 F.2d 70 at 72, (2d Cir. 1979); accord, *Caulfield v. Board of Education*, 583 F.2d 605, 610 (2d Cir. 1978); *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1358–59 (2d Cir. 1976); see Mulligan, Foreword—Preliminary Injunction in the Second Circuit, 43 Brooklyn L.Rev. 831 (1977).

■ On appeal from the granting of a preliminary injunction we disturb the relief afforded by the district court only upon a showing of either abuse of the district court's discretion or a clear mistake of law below. *New York v. Nuclear Regulatory Commission*, 550 F.2d 745, 750–51 (2d Cir. 1977); *Triebwasser & Katz v. American Telephone & Telegraph Co., supra*, 535 F.2d at 1358. We find here clear legal error necessitating reversal of the district court's order.

1. Likelihood of Success on the Merits

■ As set forth above, the second prong of the test for preliminary injunctive relief is addressed to the plaintiff's probability of success on the merits or the presence of sufficiently serious questions to create a fair basis for litigation. To resolve these issues we must first consider section 14(e) of the Williams Act, which Seaboard claims was violated by paragraph 12 of Tiger's tender offer. Section 14(e) provides in pertinent part:

It shall be unlawful for any person (1) to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not

misleading, or (2) to engage in any fraudulent, deceptive or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of such offer, request or invitation.

In the first Court of Appeals case to construe this provision of the Williams Act, Judge Friendly stated that the test of materiality under section 14(e) was whether " 'any of the stockholders who tendered their shares would probably not have tendered their shares' if the alleged violations had not occurred." *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969). Judge Timbers later phrased the test differently. He observed that "[a]ccount must be taken of all the surrounding circumstances to determine whether the fact under consideration is of such significance that a reasonable investor would weigh it in his decision whether or not to invest." *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 363 (2d Cir.), cert. denied, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973). Our most recent pronouncement on this question was issued in *Prudent Real Estate Trust v. Johncamp Realty, Inc.*, 599 F.2d 1140 (2d Cir. 1979). There Judge Friendly, writing for a unanimous panel, restated the materiality standard to conform with that adopted by the Supreme Court in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976),[6] for the closely analogous situation of Rule 14a–9 violations in proxy contests.[7] 599 F.2d at 1146; accord, *Flynn v. Bass*

**6.** Most likely as a result of the extreme time pressure in the court below, the district judge in her oral opinion applied a test of materiality less stringent than that set forth in *TSC Industries, Inc. v. Northway, Inc., supra.* Judge Motley stated:

[A] reasonable investor *might* have considered the misstatement here, false statement, important in making his decision to purchase or tender his stock. In other words, the statement made here which was false, was one which *may* have had some tendency to affect the decisions of a stockholder of the plaintiff with respect to whether to tender his stock. (emphasis added).

On the entire record of the proceedings below, however, we are convinced that the district judge would not have reached a different conclusion if the correct materiality standard had been employed. In any event, in view of our disposition of this case the error is of no practical import.

**7.** The close kinship between Rule 14a–9, 17 C.F.R. § 240.14a–9, and section 14(e) is frequently noted. Tender Offers, *supra*, at 116. Cf. *Electronic Specialty Co. v. International Controls Corp., supra*, 409 F.2d at 948.

*Brothers Enterprises, Inc.*, 456 F.Supp. 484 (E.D.Pa.1978). Under section 14, a misstatement or omission is " 'material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding' " whether to accept the tender offer.[8] *Prudent Real Estate Trust v. Johncamp Realty, Inc., supra.* The panel in *Prudent Real Estate Trust* also found helpful the Supreme Court's elaboration on this spare guideline:

> What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Id.*, quoting *TSC Industries, Inc. v. Northway, Inc., supra*, 426 U.S. at 449, 96 S.Ct. 2126.

In the case at bar, Seaboard attacks as materially misleading Tiger's tender offer statement that Seaboard's asking price of $20 per share in the event of a merger was "unrealistic." This claimed 14(e) violation was purportedly aggravated by appellant's additional comment that before Tiger commenced purchases in December, 1977 Seaboard stock had traded at $4 per share. We hold that these statements in the tender offer did not constitute a violation of 14(e).

At the outset we must note that Tiger does not dispute that the liquidation value of Seaboard's assets is approximately $20 per share. If the intent of the acquisition was to liquidate Seaboard and sell its aircraft it is conceded that the actual resale value of Seaboard's assets would substantially exceed their book value as reflected in the annual reports of that company. Seaboard, however, is a going concern. In 1978 it declared a cash dividend as well as a 10% stock dividend. Tiger's avowed purpose in its tender offer of January 19, 1978, assuming the success of the offer, was to "reopen discussions with Seaboard management with a view to the negotiation of terms for a business combination" on a going concern basis. Tiger explicitly stated it had no plans or proposals "to liquidate Seaboard" or "sell its assets."

The thrust of Seaboard's position before the CAB, as well as the concern of the Department of Justice as disclosed by the CAB's discussion in its Order No. 78–12–173 is that the acquisition of control of Seaboard will permit a combination of assets, facilities and routes which will enable Tiger illegally to strengthen its competitive position both in this nation and in the transatlantic business now dominated by Seaboard. This obviously depends upon the acquisition of a going business and not the liquidation of its assets. Seaboard does not complain here that the offeror is misrepresenting its intentions and is planning to liquidate Seaboard to profit from the sale of its assets. Rather, the complaint is that the liquidation value of Seaboard stock is $20 and that Tiger's characterization of this price as unrealistic is materially misleading.

Seaboard common stock is sold on the New York Stock Exchange and its market value is published daily both nationwide and abroad in newspapers of general circulation. The Seventh Circuit recently observed that "when market value [of stock] is available and reliable, other factors should not be utilized in determining whether the terms of a merger [are] fair." *Mills v. Electric Auto-Lite Co.*, 552 F.2d 1239, 1247 (7th Cir.), cert. denied, 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977). See also *Leighton v. American Telephone & Telegraph*, 397 F.Supp. 133, 136 (S.D.N.Y. 1975). Underlying such an approach is the "efficient market theory," which, briefly stated, is that in a free and actively traded market, absent compelling reasons to believe otherwise, the market price is held to

---

**8.** The same test was also cited in *TSC Industries, Inc. v. Northway, Inc., supra*, as appropriate in actions arising under section 10(b) of the Securities Exchange Act. 426 U.S. at 445 n.8, 96 S.Ct. 2126; see Bromberg, The Securities Law of Tender Offers, 15 N.Y.L.F. 462, 470 (1969); note 3, *supra*, and authorities there cited.

take account of asset value as well as the other economic, political, and financial factors that determine "value." See *Mills v. Electric Auto-Lite Co., supra,* 552 F.2d at 1247–48; Comment, Broker Investment Recommendations and the Efficient Capital Market Hypothesis: A Proposed Cautionary Legend, 29 Stan.L.Rev. 1077, 1089–90 (1970).

State shareholder appraisal suits, which present situations closely analogous to that at bar, have long endorsed this theory. In *In re Deutschmann,* 281 A.D. 14, 22, 116 N.Y.S.2d 578, 584 (1st Dep't 1952), dissenting shareholders of AT&T who had initiated appraisal proceedings argued that the price offered them was unfair because, although a little above the stock's current market value, the amount was substantially less than the net asset value of the shares. Nevertheless, the court held that because the market price at which the stock was traded on the New York Stock Exchange, as well as five other exchanges, was a fair reflection of the buying and selling public's estimation of the stock's value, reasonable men could not dispute the fairness of the offered price. Id. at 22–23, 116 N.Y.S.2d at 585. In *In re Marcus,* 273 A.D. 725, 727, 79 N.Y.S.2d 76, 78 (1st Dep't 1948), aff'd without opinion, 303 N.Y. 711, 103 N.E.2d 338 (1951), the court remarked that in nearly all cases in which factors other than market value were accorded much weight in determining the fairness of a price offered to a dissenting shareholder "the market was not sufficiently broad or established to be accepted as representative." On the other hand, where, as here, a reliable market for the shares exists, the market price rather than net asset value was held to establish the worth of stock in a "going concern." Id. at 28, 79 N.Y.S.2d at 79; see, e. g., *Endicott Johnson Corp. v. Bade,* 37 N.Y.2d 585, 588, 376 N.Y.S.2d 103, 106–07, 338 N.E.2d 614 (1975); 13 Fletcher's Cyclopedia of Corporations § 5906.13 at 268–69. The remarks of one commentator respecting valuation of the shares of a dissenting

stockholder under state appraisal statutes are ironically pertinent to the instant case.

In most cases liquidation value of assets is not an appropriate consideration, since "liquidation" comprehends the termination of the business and disposal of the assets. *Valuation on such a basis would be unrealistic* except possibly when the firm is insolvent or when certain assets are idle and of no further use to the company. Most courts generally prefer to look to the "going concern" value.

Note, Valuation of Dissenters' Stock Under Appraisal Statutes, 79 Harv.L.Rev. 1453, 1457 (1966) (emphasis supplied).

Here, as we have emphasized, Seaboard claims to be healthy and operating profitably. In December, 1977, as now, its shares were broadly traded on a national exchange. The price at which Seaboard stock could be purchased on that exchange in December, 1977 was about $4 per share. Tiger is accused of courting the airline not to liquidate it but to use its facilities to enhance Tiger's own competitive position. Under these circumstances we cannot find that Tiger made any materially misleading statement when it characterized the asking price of $20 per share based on an asset liquidation value as "unrealistic." [9]

Tiger did say in addition that Seaboard stock was selling at $4 per share in December, 1977. That, however, is an accurate statement of fact of which the stockholders in any event must have been aware. We simply cannot agree that this statement would reasonably be interpreted as an implicit threat to stockholders that unless they accepted the offer the market price of their shares would inevitably sink once again to the $4 level.

In hindsight counsel for the offeror might have stated that the $20 price was unrealistic for merger purposes but did represent a fair approximation of the value of a share on liquidation. He might also have added that the current market increase may only

---

**9.** We do not, of course, suggest that Seaboard's management was acting in bad faith if in light of its knowledge of conditions it considered Tiger's offer less than Seaboard should seek to obtain.

partially be due to Tiger's purchase of shares and may in some part represent increased profitability in the Seaboard operation. We do not think, however, that such second guessing is appropriate in this context. As Judge Friendly pointed out in *Electronic Specialty Co. v. International Controls Corp., supra,* at 948:

> [P]articipants [in a tender offer] act not "in the peace of a quiet chamber," . . but under the stresses of the market place. They act quickly, sometimes impulsively, often in angry response to what they consider, whether rightly or wrongly, to be low blows by the other side. Probably there will no more be a perfect tender offer than a perfect trial. Congress intended to assure basic honesty and fair dealing, not to impose an unrealistic requirement of laboratory conditions that might make [the Williams Act] a potent tool for incumbent management to protect its own interests against the desires and welfare of the stockholders. These considerations bear on the kind of judgment to be applied in testing conduct—of both sides—and also on the issue of materiality. (citations omitted).

Courts have frequently echoed this practical recognition of the realities of the tender offer or the proxy statements. See, e. g., *Kennecott Copper Corp. v. Curtiss-Wright Corp.,* 584 F.2d 1195, 1200 (2d Cir. 1978); *Ash v. LFE Corp.,* 525 F.2d 215, 221 (3d Cir. 1975); *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1300 n.19 (2d Cir. 1973); *General Time Corp. v. Talley Industries, Inc.,* 403 F.2d 159, 162 (2d Cir. 1968), cert. denied, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969). We would truly be engaging in a nit-picking exercise, *Kohn v. American Metal Climax, Inc.,* 458 F.2d 255, 267 (3d Cir.), cert. denied, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972), were we to fault the offeror in this case for not expounding in the tender offer on its use of the term "unrealistic."

There are further circumstances which we think are relevant in determining the materiality of Tiger's statement under section 14(e). The allegedly misleading statement here was made by the offeror—not the target company—and it related to the value of the stock of the target company. In *Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851, 873 (2d Cir.), cert. denied, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974), we commented: "Courts should tread lightly in imposing a duty of self-flagellation on offerors with respect to matters that are known as well, or almost as well, to the target company; some issues concerning a contested offer may safely be left for the latter's riposte." (footnote deleted).

In that case we rejected a claim that a tender offer was false and misleading for not disclosing the possible antitrust implications of a prospective acquisition. Id. In this case, of course, the tender offer fully reports the pending CAB hearings where that issue will be litigated. Rather, the question here is the value of the stock of the target company, a subject which quite patently is better known to the target company than to the offeror. There is no question of inside information obtained by the offeror which is unknown to the target's management; the issue involves the valuation of Seaboard's most obvious assets.

Yet there was no "riposte" here. As we have indicated, as early as March, 1978 Seaboard stated that its $20 asking price was based on the liquidation value of its aircraft. Tiger rejected that approach not only in correspondence with Seaboard but in its amended Schedule 13D, which was filed with the SEC and available to the public on April 19 of that year. Seaboard had ample opportunity to make its position clear to the stockholders whom it now alleges were misled by Tiger's statement. But the record does not reveal, and Seaboard does not claim to have made, any effort to rebut Tiger's characterization of its $20 asking price by apprising its stockholders of the value of its aircraft if the corporation were liquidated and these assets sold.[10] *Cum tacent clamant.*

---

10. The only public response by Seaboard to Tiger's tender offer which is reflected in the record was a January 26, 1979 press release published in the Wall Street Journal. While

In *Chris-Craft Industries, Inc. v. Piper Aircraft Corp., supra,* 480 F.2d at 364, we stressed the "high fiduciary duty of honesty and fair dealing" owed to stockholders by target management. See *Emhart Corp. v. USM Corp.,* 403 F.Supp. 660, 662 (D.Mass.), rev'd on other grounds, 527 F.2d 177 (1st Cir. 1975); E. Aranow, H. Einhorn & G. Berlstein, Developments in Tender Offers for Corporate Control 80 (1977). If, as claimed by Seaboard, the corporate books did not reflect the true value of the company's assets, one would have expected a target which is resisting acquisition forcefully to express this fact. Seaboard was clearly in a position to inform its shareholders of what it now claims was a "degree of corporate arrogance and avarice [by Tiger] that is seldom encountered and never countenanced." While we applaud altruism, avarice and covetousness are endemic in all takeover cases.

Under these circumstances we believe our comments in *General Time Corp. v. Talley Industries, Inc., supra,* 403 F.2d at 162 to be particularly appropriate. "[F]ailure of the other side 'to correct alleged misstatements or rectify claimed omissions is some evidence that it did not regard them as material.'" Accord, *Kennecott Copper Corp. v. Curtiss-Wright Corp., supra,* 584 F.2d at 1200 n.4; see L. Loss, Vol. V Securities Regulation at 2865.

The target company had long been aware of Tiger's contention, first made in its SEC filing in April, 1978 and repeated *in haec verba* in the tender offer of January 18, 1979, that the $20 asking price was "unrealistic." Yet Seaboard waited until February 7, 1979, one day before the initially scheduled expiration date of the tender offer, to bring this action for a temporary restraining order and injunctive relief.

Seaboard's explanation for its delay in countering the allegedly materially misleading material in the Tiger tender offer is not persuasive. Seaboard claims that it was not until February 6, 1979, when Tiger opposed an order of the Administrative Law

Judge ordering disclosure, *inter alia,* of Tiger's financial and economic analysis of Seaboard, that it had reason to suspect and ultimately to expose Tiger's "illegal activity." The discovery of the Tiger documents which had previously been furnished to the Administrative Law Judge in the CAB proceedings, however, merely revealed that Tiger analysts had made its management aware that the liquidation value of Seaboard's aircraft exceeded the book value of those assets. That was no secret. Seaboard's chief executive had made the same point to Tiger in March of 1978. Tiger's reply of March 16, 1978, to which we have referred, did not suggest that Tiger rejected the facts and calculations underlying the figures proposed by Seaboard. Instead, Tiger countered by observing that on such a basis its own stock would be worth four and one-half times its current market value and by pointing out the impracticality of such a mode of valuation when an acquisition is sought as a going concern.

It is evident that Tiger from the beginning considered liquidation value an unrealistic basis for the negotiation of a merger. The authorities we have discussed support the reasonableness of that position. Furthermore, if Seaboard actually considered Tiger's statement of this position misleading, it had ample opportunity to make its position known to its stockholders.

If Seaboard had contended that the so-called "secret documents" revealed Tiger's intent to "milk the cow," to sell its assets and profit at the expense of those stockholders who were gulled by misrepresentations of the offeror into the belief that it would continue Seaboard's operations, then we would have a proper controversy before us. However, that is not the appellee's position before this court. Rather, Seaboard maintains that Tiger's "primary objective" is to make Seaboard "part of [Tiger's] successful air cargo operation." The discovered memoranda only suggest that in the view of the anonymous authors of the worksheets in the record, even if Tiger's

---

asserting that Tiger's offer price was "inadequate," that release did not state or even intimate that the inadequacy was related to the immense value of Seaboard's aircraft.

goal of operating Seaboard more profitably than present management were not achieved the resale value of Seaboard's aircraft provided a solid "fallback" position. Obviously in an undertaking of this scope all contingencies would be of concern to the offeror. However, this evidences no clandestine plan by Tiger to dismantle the target company.

In sum, Seaboard cannot have it both ways. It argues before this court that the true value of Seaboard's stock is established by the price its aircraft would bring if the company were liquidated and these assets sold. Yet Seaboard's position before the CAB, and not disavowed here, is that Tiger's *operation* of Seaboard—its use of Seaboard's aircraft—will create anti-competitive questions. That is also the posture in the CAB proceeding of the Department of Justice. We obviously express no view on that question; it is thankfully not before us. Suffice it to say that on the record before us the CAB is clearly the arena in which the contest should be waged. The present litigation, in our view, is merely a last minute effort to delay and thereby defeat the tender offer by resort to the Williams Act. See *Electronic Specialty Co. v. International Controls Corp., supra,* 409 F.2d at 947. See also *Prudent Real Estate Trust v. Johncamp Realty, Inc., supra,* 599 F.2d at 1148. We find the claim of a section 14(e) violation totally unpersuasive for the reasons discussed above.

2. Irreparable Harm

■ Finding no possible success on the merits, we need not dwell extensively, if at all, on the subject of irreparable harm. However, we do note that the shares acquired through the tender offer have all been placed in a blind trust pursuant to the order of the CAB. Tiger cannot acquire direct control of these shares or vote them until Seaboard is given the opportunity to be heard before that agency, which is charged with the responsibility for determining whether the combination which Tiger seeks to effect would violate either the Clayton or the Federal Aviation Acts. Of

course, as discussed above, the CAB has already found no harm to Seaboard or the public interest in Tiger's mere ownership of the stock in these circumstances, and this finding has been affirmed by the Circuit Court of Appeals for the District of Columbia.

Moreover, despite Seaboard's suggestion to the contrary, in view of the blind trust device this is not a situation in which a court would later have difficulty "unscrambling the eggs" due to a prompt commingling or sale of the target's assets by the acquiring company. Cf. *F.T.C. v. PepsiCo., Inc.,* 477 F.2d 24, 31 (2d Cir. 1973); *United States v. Culbro Corp.,* 436 F.Supp. 746, 756 (S.D.N.Y.1977).

Nor are we persuaded by the argument that irreparable harm exists because continuation of the tender offer is disruptive and jeopardizes the morale of Seaboard management. "[D]istrict judges should take arguments of serious harm to a corporation due to jitters in executive suites with a fair amount of salt; the demoralizing effect, if any, would generally be limited to the fairly short period that tender offers usually run." *Missouri Portland Cement Co. v. Cargill, Inc., supra,* 498 F.2d at 869 n.36; accord, *Otis Elevator Co. v. United Technologies Corp.,* 405 F.Supp. 960, 973 (S.D.N.Y.1975). The uneasiness of a target's management exists in any takeover.

Seaboard also argues that so-called "White Knights" are deterred from purchasing its shares because of the large block of stock held by Tiger. Tiger had already acquired a 15.6% interest in Seaboard common stock by October, 1978. Its acquisition of an additional 9.4% was authorized by the CAB in December, 1978. We cannot see how this increment would prove to be a barrier to a White Knight.

For the foregoing reasons, the preliminary injunction was dissolved as improvidently granted by our order of March 9, 1979. In view of our conclusions we see no issues justifying further litigation in the district court. Accordingly, we now remand this matter to the district court with directions to dismiss the complaint. See

**366**

*Electronic Specialty Co. v. International Controls Corp., supra,* 409 F.2d at 952.

MANSFIELD, Circuit Judge (dissenting):

The majority holds that as a matter of law Seaboard cannot prove a violation by Tiger of § 14(e) of the Williams Act, 15 U.S.C. § 78n(e), and therefore remands to the district court with directions to dismiss the complaint. I dissent.

Section 14(e), 15 U.S.C. § 78n(e), prohibits the making of untrue or misleading statements of material fact in connection with any tender offer. A misstatement or omission is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding" whether to accept the offer. *Prudent Real Estate Trust v. Johncamp Realty, Inc.,* 599 F.2d 1140, 1146, (2d Cir. 1979), quoting from *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

It defies common sense and experience not to recognize that a stockholder, in deciding whether or not to accept a cash tender offer for his shares, would consider the various types of value attached to them by his own company and by the tenderor to be extremely important. Current market value is obviously of considerable significance. But if book or liquidation value were much higher, it could be of equal importance. For if a stockholder offered $13.50 per share knew that upon liquidation he could expect to receive $20 per share he might reasonably decide to hold on to his stock rather than sell, secure in the knowledge that if profits improved the shares might increase in value but that if the company experienced reverses he could fall back upon its liquidation value. If, in addition, it were revealed that for the same reasons the tender offeror had considered the higher $20 liquidation value a significant factor in offering $13.50 per share, he might well decide that, rather than accept the $13.50 offer, he should wait for a higher one.

Applying these basic principles here, Tiger's Offer to Purchase was definitely misleading. It stated in relevant part:

"Seaboard management indicated that its directors would consider a merger only if Seaboard's other stockholders will receive value of the order of magnitude of $20 (approximately $18.18 as so adjusted [for the 10% Common Stock dividend]) per share. Tiger regarded Seaboard's suggested price as unrealistic (the Common Stock had traded at $4, about $3.64 as so adjusted, per share in December, 1977, before Tiger commenced its purchases, see Section 9)."

The statement implied that the figure of $20 per share was created out of thin air by Seaboard's management, whereas in actuality it represented the liquidation value of the company as calculated by Seaboard, which Tiger does not dispute. Indeed, Tiger itself reached a similar figure during its analysis of Seaboard prior to the decision to make the tender offer and treated it as an important factor of advantage to it in deciding to make the offer.

Tiger now argues that as a matter of law an admittedly much higher liquidation value of a target company is irrelevant if the offeror's intention is to operate the target as a going concern, rendering it not materially misleading for Tiger simply to state that the $20 per share figure was "unrealistic." The majority appears to agree with that contention. I do not.

Tiger did *not* state in its tender offer, as it did in the letter to Seaboard's management quoted in the majority's opinion, that $20 per share was a fair liquidation value but unrealistic for Tiger's particular merger purposes as stated in the offer. Instead, Tiger in the tender offer implied that the $20 per share figure was in all possible lights totally without basis by juxtaposing the $20 figure with the $4 per share market value in December, 1977, thus creating the misleading impression that no sound calculation would yield a $20 per share value and that no potential purchaser would ever consider offering that price per share to Seaboard's stockholders.

In fact the $20 per share figure, as Tiger's own documents reveal, is an accurate

and "realistic" reflection of the liquidation value of Seaboard. The Tiger documents produced at the preliminary injunction hearing further show that its analysts, in recommending the potential merger to their management, saw the $20 per share liquidation value as an important fact to be weighed in making its offer because, even though the plan was to maintain Seaboard as a going concern, liquidation value offered a relatively secure fall-back position if operations should prove to be unprofitable. For the same reason, the figure was material to Seaboard stockholders.

Moreover, Tiger's statement that a $20 per share figure is "unrealistic" implied that in Tiger's view no other purchaser would approach that figure, contrary to the suggestions of Seaboard's management. In fact, Tiger's documents reveal that a potential purchaser viewing Seaboard for liquidation of its assets would indeed see $20 per share as a realistic price, and even a potential purchaser seeking Seaboard as a going concern would probably, like Tiger, consider Seaboard's high liquidation value as quite relevant. Knowledge of these facts could well influence a shareholder's calculation of the likelihood that a better offer would be made. The phrasing of the tender offer not only deprived Seaboard's shareholders of this information but also mischaracterized the position of Seaboard's management at the same time.

The issue is not whether the price offered by Tiger was "fair" or which of the two figures—market value or liquidation value—this court feels is the more accurate price if the target company is to be kept as a going concern. The issue is whether there was "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Prudent Real Estate Trust v. Johncamp Realty, Inc.,* supra, at 1147, quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). The unrebutted credible evidence at the preliminary injunction hearing was more than ample to establish that Tiger knew the $20 per

share figure was based on the liquidation value of Seaboard, Tiger agreed with that liquidation value, and Tiger's own analysts felt that liquidation value was a relevant factor in deciding whether to buy Seaboard stock. Seaboard's management was actively seeking another purchaser who would be willing to offer a higher price because of the high liquidation value of Seaboard's assets, and the likelihood that such a higher price could be obtained from another purchaser would be highly relevant to shareholders deciding whether to accept the present offer.

For these reasons I fail to see how the majority can find as a matter of law that it would not be of interest to a Seaboard shareholder, in deciding whether to sell, to know that in fact Tiger viewed the $20 per share figure as totally realistic for purposes of liquidation and as a matter of relevance in deciding whether to merge as a going concern. Thus Seaboard has established a probability of success on the merits.

It is hardly "nit-picking" to require that obvious half-truths with respect to such an important matter as the value of Seaboard's shares not be placed in a tender offer. Although Tiger's letter to Seaboard's management explained the difference in viewpoint between the two firms regarding the propriety of using market value or liquidation value for purposes of merger as a going concern, it was silent as to the relevance Tiger in fact attached to liquidation value in determining whether to purchase Seaboard stock for a possible merger as a going concern. The tender offer through its brevity in merely using the catch phrase "unrealistic" and then juxtaposing the $20 figure with the $4 market value figure from December, 1977, falsely implied that the $20 per share value was created out of thin air by Seaboard's management and unlikely to be matched by any other potential offeror regardless of its purpose in acquiring Seaboard. This was untrue. The statement was thus misleading with respect to a matter of considerable importance to the shareholders.

**368**

I disagree with the majority's view that Tiger is excused from its obligations under the law because Seaboard's management did not choose to combat the misleading statements in the tender offer through literature of its own. Viewed most favorably to Tiger, Seaboard's decision to sue rather than conduct a battle of words through the media would merely be "some evidence" on the issue of materiality. *General Time Corp. v. Talley Industries, Inc.*, 403 F.2d 159, 162 (2d Cir. 1968), *cert. denied*, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969), quoted in *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1200 n.4 (2d Cir. 1978). Moreover, the most that Seaboard could furnish to its stockholders at that stage by way of a "riposte" was its own management's calculation of liquidation value, the credibility of which would be open to question because of its own interest in opposing a takeover. Of far greater materiality to Seaboard stockholders would be the knowledge that Tiger itself, which was offering only $13.50 per share, had appraised the stock as worth approximately $20 per share on liquidation and considered this to be to its advantage in making the offer. Since Seaboard did not learn this crucial fact until after the lawsuit had been commenced, it was hardly in a position, as the majority suggests, to furnish the information at an earlier point to its stockholders.

Nor would requiring greater care on the part of Tiger constitute "imposing a duty of self-flagellation on offerors," as in *Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 873 (2d Cir. 1974), *cert. denied*, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974). In *Missouri Portland* the target company was urging that it was false and misleading for the offeror to fail to include some mention in its offer of the possibility that an antitrust law violation would result from a successful tender offer. We concluded that it would have been reasonable under the circumstances for the offeror to conclude that no antitrust problems existed. Obviously in such a case it would approach "self-flagellation" for the offeror to raise in its offer an issue which it had reasonably con-

cluded did not exist at all. But the offeror would not have been free to state that all fears of potential antitrust problems were unrealistic if its own documents revealed that in fact it was quite concerned about the antitrust implications of the merger. In the present case, Tiger chose to express its view on Seaboard management's position concerning the appropriate value of the shares; having decided to embark on this path, Tiger had an obligation to avoid materially misleading statements.

Finally, I cannot agree with the majority that Judge Motley abused her discretion in finding irreparable harm to Seaboard if the preliminary injunction was not issued. As Judge Motley noted in her opinion, a representative of Kidder Peabody & Co. testified as an expert witness that there would be a "very serious impact" on his firm's efforts to find another purchaser for the Seaboard stock (a so-called "White Knight") at a higher price than Tiger's offer if the tender offer should be permitted to be consummated. Tiger presented no evidence to the contrary. The record therefore amply supports the findings below.

For these reasons I dissent from the dismissal of the complaint and from the reversal of the judgment below. I would affirm the grant of the preliminary injunction.