Keating, J.
Isador Katzowitz is a director and stockholder of a close corporation. Two other persons, Jacob Sidler and Max Lasker, own the remaining securities and, with Katzowitz, comprise Sulburn Holding Corp.’s board of directors. Sulburn was organized in 195'5 to supply propane gas to three other corporations controlled by these men.[1] Sulburn’s certificate of incorporation authorized it to issue 1,000 shares of no par value stock for which the incorporators established a $100 selling price. Katzowitz, Sidler and Lasker each invested $500 and received five shares of the corporation’s stock.
The three men had been jointly engaged in several corporate [1] ventures for more than 25 years. In this period they had always been equal partners and received identical compensation from *515 the corporations they controlled. Though all the corporations controlled by these three men prospered, disenchantment with their inter-personal relationship flared into the open in 1956. At this time, Sidler and Lasker joined forces to oust Katzowitz from any role in managing the corporations. They first voted to replace Katzowitz as a director of Sullivan County G-as Company with the corporation’s private counsel. Notice of directors’ meetings was then caused to be sent out by Lasker and Sidler for Burnwell G-as Corporation. Sidler and Lasker advised Katzowitz that they intended to vote for a new board of directors. Katzowitz at this time held the position of manager of the Burnwell facility.
Katzowitz sought a temporary injunction to prevent the meeting until his rights could be judicially determined. A temporary injunction was granted to maintain the status quo until trial. The order was affirmed by the Appellate Division (Katzowitz v. Sidler, 8 A D 2d 726).
Before the issue could be tried, the three men entered into a stipulation in 1959 whereby Katzowitz withdrew from active participation in the day-to-day operations of the business. The agreement provided that he would remain on the boards of all the corporations, and each board would be limited to three members composed of the three stockholders or their designees. Katzowitz was to receive the same compensation and other fringe benefits which the controlled corporations paid Lasker and Sidler. The stipulation also provided that Katzowitz, Sidler and Lasker were “ equal stockholders and each of said parties now owns the same number of shares of stock in each of the defendant corporations and that such shares of stock shall continue to be in full force and effect and unaffected by this stipulation, except as hereby otherwise expressly provided.” The stipulation contained no other provision affecting equal stock interests.
The business relationship established by the stipulation was fully complied with. Sidler and Lasker, however, were still interested in disassociating themselves from Katzowitz and purchased his interest in one of the gas distribution corporations and approached him with regard to the purchase of his interest in another.
*516 In December of 1961 Sulburn was indebted to each stockholder to the extent of $2,500 for fees and commissions earned np until September, 1961. Instead of paying this debt, Sidler and Lasker wanted Sulburn to loan the money to another corporation which all three men controlled. Sidler and Lasker called a meeting of the board of directors to propose that additional securities be offered at $100 per share to substitute for the money owed to the directors. The notice of meeting for October 30, 1961 had on its agenda ‘ ‘ a proposition that the corporation issue common stock of its unissued common capital stock, the total par value which shall equal the total sum of the fees and commissions now owing by the corporation to its * * * directors ”. (Emphasis added.) Katzowitz made it quite clear at the meeting that he would not invest any additional funds in Sulburn in order for it to make a loan to this other corporation. The only resolution passed at the meeting was that the corporation would pay the sum of $2,500 to each director.
With full knowledge that Katzowitz expected to be paid his fees and commissions and that he did not want to participate in any new stock issuance, the other two directors called a special meeting of the board on December 1, 1961. The only item on the agenda for this special meeting was the issuance of 75 shares of the corporation’s common stock at $100 per share. The offer was to be made to stockholders in “ accordance with their respective preemptive rights for the purpose of acquiring additional working capital ”. The amount to be raised was the exact amount owed by the corporation to its shareholders. The offering price for the securities was 1/18 the book value of the stock. Only ¡Sidler and Lasker attended the special board meeting. They approved the issuance of the 75 shares.
Notice was mailed to each stockholder that they had the right to purchase 25 shares of the corporation’s stock at $100 a share. The offer was to expire on December 27, 1961. Failure to act by that date was stated to constitute a waiver. At about the same time Katzowitz received the notice, he received a check for $2,500 from the corporation for his fees and commissions. Katzowitz did not exercise his option to buy the additional shares. Sidler and Lasker purchased their full complement, 25 shares each. This purchase by Sidler and Lasker caused an *517 immediate dilution of the book value of the outstanding securities.
On August 25, 1962 the principal asset of Sulburn, a tractor trailer truck, was destroyed. On August 31, 1962 the directors unanimously voted to dissolve the corporation. Upon dissolution, Sidler and Lasker each received $18,885.52 but Katzowitz only received $3,147.59
The plaintiff instituted a declaratory judgment action to establish his right to the proportional interest in the assets of Sulburn in liquidation less the $5,000 which Sidler and Lasker used to purchase their shares in December, 1961.
Special Term (Westchester County) found the book value of the corporation’s securities on the day the stock was offered at $100 to be worth $1,800. The court also found that ‘1 the individual defendants * * # decided that in lieu of taking that sum in cash [the commissions and fees due the stockholders], they preferred to add to their investment by having the corporate defendant make available and offer each stockholder an additional twenty-five shares of unissued stock.” The court reasoned that Katzowitz waived his right to purchase the stock or object to its sale to Lasker and Sidler by failing to exercise his pre-emptive right and found his protest at the time of dissolution untimely.
The Appellate Division (Second Department), two Justices dissenting, modified the order of Special Term. The modification was procedural. The decretal paragraph in Special Term’s order was corrected by reinstating the complaint and substituting a statement of the parties’ rights. On the substantive legal issues and findings of fact, the Appellate Division was in agreement with Special Term. The majority agreed that the book value of the corporation’s stock at the time of the stock offering was $1,800. The Appellate Division reasoned, however, that showing a disparity between book value and offering price was insufficient without also showing fraud or overreaching. Disparity in price by itself was not enough to prove fraud. The Appellate Division also found that the plaintiff had waived his right to object to his recovery in dissolution by failing to either exercise his pre-emptive rights or take steps to prevent the sale of the stock.
*518 The concept of pre-emptive rights was fashioned by the judiciary to safeguard two distinct interests of stockholders — the right to protection against dilution of their equity in the corporation and protection against dilution of their proportionate voting control. (Ballantine, Corporations [rev. ed., 1946], § 209.) After early decisions (Gray v. Portland Bank, 3 Mass. 364; Stokes v. Continental Trust Co., 186 N. Y. 285), legislation fixed the right enunciated with respect to proportionate voting but left to the judiciary the role of protecting existing shareholders from the dilution of their equity (e.g., Stock Corporation Law, § 39, now Business Corporation Law, § 622; see Drinker, The Preemptive Bight of Shareholders to Subscribe to New Shares, 43 Harv. L. Bev. 586; Frey, Shareholders’ Pre-emptive Bights, 38 Yale L. J. 563).
It is clear that directors of a corporation have no discretion in the choice of those to whom the earnings and assets of the corporation should be distributed. Directors, being fiduciaries of the corporation, must, in issuing new stock, treat existing shareholders fairly. (Dunlay v. Avenue M Garage & Repair Co., 253 N. Y. 274, 278-280; Albrecht, Maguire & Co. v. General Plastics, 256 App. Div. 134, affd. 280 N. Y. 840; Hammer v. Werner, 239 App. Div. 38, 42.) Though there is very little statutory control over the price which a corporation must receive for new shares (Stock Corporation Law, §!§ 12, 27, 69, 74; Business Corporation Law, § 504) the power to determine price much be exercised for the benefit of the corporation and in the interest of all the stockholders (see, e.g., Bodell v. General Gas d Elec. Corp., 15 Del. Ch. 119, affd. 15 Del. Ch. 420; Minn. Stat., § 301.16 [1953]).
Issuing stock for less than fair value can injure existing shareholders by diluting their interest in the corporation’s surplus, in current and future earnings and in the assets upon liquidation. Norma,lly, a stockholder is protected from the loss of his equity from dilution, even though the stock is being offered at less than fair value, because the shareholder receives rights which he may either exercise or sell. If he exercises, he has protected his interest and, if not, he can sell the rights, thereby compensating himself for the dilution of his remaining shares in the equity *519 of the corporation (Schramme v. Cowin, 205 App. Div. 20, 23; Noble v. Great Amer. Ins. Co., 200 App. Div. 773, 778-779).[2]
When new shares are issued, however, at prices far below fair value in a close corporation or a corporation with only a limited market for its shares, existing stockholders, who do not want to invest or do not have the capacity to invest additional funds, can have their equity interest in the corporation diluted to the vanishing point. (2 Hornstein, Corporation Law and Practice, § 624, pp. 152-153.)
The protection afforded by stock rights is illusory in close corporations. Even if a buyer could be found for the rights, they would have to be sold at an inadequate price because of the nature of a close corporation. Outsiders are normally discouraged from acquiring minority interests after a close corporation has been organized. Certainly a stockholder in a close corporation is at a total loss to safeguard his equity from dilution if no rights are offered and he does not want to invest additional funds.
Though it is difficult to determine fair value for a corporation’s securities and courts are therefore reluctant to get into the thicket, when the issuing price is shown to be markedly below book value in a close corporation and when the remaining shareholder-directors benefit from the issuance, a case for judicial relief has been established. In that instance, the corporation’s directors must show that the issuing price falls within some range which can be justified on the basis of valid business reasons. (See Borden r. Guthrie, 23 A D 2d 313 [concurring opn. of Breitel, J. P.], affd. 17 N Y 2d 571; Steven v. Hale-Haas Corp., 249 Wis. 205.) If no such showing is made by the diree *520 tors, there is no reason for the judiciary to abdicate its function to a majority of the board of stockholders who have not seen fit to come forward and justify the propriety of diverting property from the corporation and allow the issuance of securities to become an oppressive device, permitting the dilution of the equity of dissident stockholders.
The defendant directors here make no claim that the price set was a fair one. No business justification is offered to sustain it (Blaustein v. Pan Amer. Petroleum & Transp. Co., 293 N. Y. 281, 303-304; Pollitz v. Wabash R. R. Co., 207 N. Y. 113,124). Admittedly, the stock was sold at less than book value. The defendants simply contend that, as long as all stockholders were given an equal opportunity to purchase additional shares, no stockholder can complain simply because the offering dilutes Ms interest in the corporation.
The defendants’ argument is fallacious.
The corollary of a stockholder’s right to maintain his proportionate equity in a corporation by purchasing additional shares is the right not to purchase additional shares without being confronted with dilution of Ms existing equity if no valid business justification exists for the dilution. (Bennett v. Breuil Petroleum Corp., 34 Del. Ch. 6; Steven v. Hale-Haas Corp., 249 Wis. 205, supra; Gord v. Iowana Farms Milk Co., 245 Iowa 1; Browning v. C & C Plywood Corp., 248 Ore. 574; see Tashman v. Tashman, 13 Misc 2d 982; Berle, Corporate Powers as Powers in Trust, 44 Harv. L. Rev. 1049, 1055-1060; Berle, Corporate Devices for Diluting Stock Participations, 31 Col. L. Rev. 1239, 1241-1243, 1257-1260 ; Morawetz, The Preemptive Right of Shareholders, 42 Harv. L. Rev. 186, 188.)
A stockholder’s right not to purchase is seriously undermined if the stock offered is worth substantially more than the offering price. Any purchase at tMs price dilutes Ms interest and impairs the value of his original holding. “ A corporation is not permitted to sell its stock for a legally inadequate price at least where there is objection. Plaintiff has a right to insist upon compliance with the law whether or not he cares to exercise his option. He cannot block a sale for a fair price merely because he disagrees with the wisdom of the plan but he can insist that the sale price be fixed in accordance with legal *521 requirements.” (Bennett v. Breuil Petroleum Corp., supra, pp. 14-15.) Judicial review in this area is limited to whether under all the circumstances, including the disparity between issuing price of the stock and its true value, the nature of the corporation, the business necessity for establishing an offering price at a certain amount to facilitate raising new capital, and the ability of stockholders to sell rights, the additional offering of securities should be condemned because the directors in establishing the sale price did not fix it with reference to financial considerations with respect to the ready disposition of securities.
Here the obvious disparity in selling price and book value was calculated to force the dissident stockholder into investing additional sums. No valid business justification was advanced for the disparity in price, and the only beneficiaries of the disparity were the two director-stockholders who were eager to have additional capital in the business.
It is no answer to Katzowitz’ action that he was also given a chance to purchase additional shares at this bargain rate. The price was not so much a bargain as it was a tactic, conscious or unconscious on the part of the directors, to place Katzowitz in a compromising situation. The price was so fixed to make the failure to invest costly. However, Katzowitz at the time might not have been aware of the dilution because no notice of the effect of the issuance of the new shares on the already outstanding shares was disclosed (Gord v. Iowana Farms Milk Co., supra, p. 18). In addition, since the stipulation entitled Katzowitz to the same compensation as Sidler and Lasker, the disparity in equity interest caused by their purchase of additional securities in 1961 did not affect stockholder income from Sulburn and, therefore, Katzowitz possibly was not aware of the effect of the stock issuance on his interest in the corporation until dissolution.
No reason exists at this time to permit Sidler and Lasker to benefit from their course of conduct. Katzowitz’ delay in commencing the action did not prejudice the defendants. By permitting the defendants to recover their additional investment in Sulburn before the remaining assets of Sulburn are distributed to the stockholders upon dissolution, all the stockholders will be treated equitably. Katzowitz, therefore, should receive *522 his aliquot share of the assets of Sulburn less the amount invested by Sidler and Lasker for their purchase of stock on December 27, 1961.
Accordingly, the order of the Appellate Division should be reversed, with costs, and judgment granted in favor of the plaintiff against the individual defendants.
Judges Burke, Scileppi, Bergan, Breitel and Jasen concur with Judge Keating ; Chief Judge Fuld dissents and votes to affirm on the opinion at the Appellate Division.
Order reversed, with costs, and case remitted to Special Term for further proceedings in accordance with the opinion herein.

. The original name of the corporation was Sulburn Gas Corporation. The name was changed on May 19, 1961.

. ‘There is little justification for issuing stock far below its fair value. The only reason for issuing stock below fair value exists in publicly 'held corporations where the problem of floating new issues through subscription is concerned. The reasons advanced in this situation is that it insures the success of the issue or that it has the same psychological effect as a dividend (Guthman and Dagell, Corporate Financial Policy [3d ed., 1955], p. 369).
On rare occasions stock will be issued below book value because this indicia of value is not reflective of the actual worth of the corporation. The book value of the corporation’s assets may be inflated or the company may not be glamorous to the public because it is in a declining industry or the company may be under the direction of poor management. In these circumstances there may be a business justification for a major disparity in issuing price and book value in order to inject new capital into the corporation. (See, e.g., Conklin v. United Constr. & Supply Co., 166 App. Div. 284, affd. 219 N. Y. 555.)