Fuchsberg, J.
This proceeding was brought pursuant to section 623 of the Business Corporation Law to fix the fair value of the stock of respondent stockholders, who had dissented from a proposed merger as a result of which petitioner Endicott Johnson Corporation was to become a wholly-owned subsidiary of McDonough Corporation. Special Term, confirming and adopting the report of the appraiser it had appointed, fixed, inter alia, the fair value of the common stock at $45.75. The Appellate Division having modified the order of Special Term by reducing the valuation of the stock to $42.77 per share and having increased the amount of fees allowed to one of respondents’ counsel, both sides now appeal.
At the heart of the issues involved are the weight required to be given to the market price of the stock and whether a value for negative good will should have been included, as such, in fixing that fair value.
The general principles applicable here are clear. Dissenting stockholders were entitled to be paid the "fair value” of their Endicott common stock, excluding any appreciation or depreciation due to the merger or its proposal. (Business Corporation Law, § 623.) Although the statute itself is silent as to how fair value is to be determined, it is well established by case law that, in our State, the elements which are to enter into such an appraisal are net asset value, investment value and market value. (Matter of Fulton, 257 NY 487; 13 Fletcher’s Cyclopedia Corporations [rev ed], § 5906.12, p 265; Comment, Appraisal Statutes — Elements in Valuation of Corporate Stock, 55 Mich L Rev 689; Comment, Valuation of Dissenters’ Stock under Appraisal Statutes, 79 Harv L Rev 1453.) While, in order to provide the elasticity deemed necessary to reach a just result, all three factors are to be considered, the weight to be accorded to each varies with the facts and circumstances in a particular case. (Matter of Behrens, 61 NYS2d 179, affd 271 App Div 1007; Matter of Marcus [Macy & Co.], 273 App Div 725, 729-731, 277 App Div 963, affd 303 NY 711.)
*588 The ultimate valuation to the extent that it is confined to the issues of fact, rests largely within the discretion of the lower courts (Cohen and Karger, Powers of the New York Court of Appeals, § 148, pp 589-590), to whose review the appraiser’s findings are subject. (Amella v Consolidated Edison Co. of N. Y., 73 NYS2d 263, affd 273 App Div 755.) As we said in Matter of Fulton (257 NY 487, 494), "No rule can be laid down for determining the actual or true value of stock of a given class except one of a very general, nature and which may, in a particular case, be inapplicable * * * because of the existence of a state of facts peculiar to the situation involved in the particular case.”
It follows that all three elements do not have to influence the result in every valuation proceeding. It suffices if they are all considered. Compelling the consideration of all of them, including those which may turn out to be unreliable in a particular case, has the salutary effect of assuring more complete justification by the appraiser of the conclusion he reaches. It also provides a more concrete basis for court review.
The three elements are not always discrete; definitionally, they may even flow into one another. For instance, in this very case, by their general concurrence that it would here be inappropriate, no estimation of net asset value was attempted by the parties or the appraiser. Since the corporation was not being liquidated, but was to continue to operate as part of the surviving parent McDonough Corporation, that made business and legal sense. For, in cases of nonliquidation, to the extent that net asset value might include elements such as good will and potential earnings, these are invariably taken into account, in any event, among the numerous tangible and intangible factors that enter into judgment of the investment value of going concerns, whether by experienced appraisers or prudent investors. (See Matter of Seaich, 170 App Div 686, affd 219 NY 634; Von Au v Magenheimer, 126 App Div 257; 13 Fletcher’s Cyclopedia Corporations [rev ed], op. cit., § 5906.15, p 274-275.)
Indeed, in this case investment value, for all practical purposes, became the sole determinant of fair value when the appraiser eliminated market value as a meaningful factor by reporting as follows:
"My opinion is that little weight should be given to the past history of market value prior to 1969 because I believe that *589 there was a radical enough change in the management of the company so that it had 'turned around’, and that the pre-1969 market is not particularly helpful.
"I agree with the thinking of the text writers that a dramatic change in leadership for the good may be valid grounds for disregarding company’s [sic] past history of weakness.
"Subsequent to 1969 I believe the market became so thin because of the control of McDonough and the subsequent delisting that it is fairly meaningless.”
Endicott, pointing to an average market price of $26.25 per share in public trading of the stock for the six months immediately preceding the announcement of the merger, argues that market value was required to be given substantial weight and that the lower courts acted contrary to law in adopting that part of the appraiser’s report which had failed to do so. In further support of its position, Endicott, among other things, asserts that, during the premerger period it regards as relevant, McDonough controlled only 31.8% of the common shares, the remainder constituting a large enough public float in the hands of over two thousand stockholders to ensure a free and active market. On the other hand, the stockholders, relying heavily on such facts as the stock’s delisting from the New York Stock Exchange, its relegation for a year before the merger to being traded on the over-the-counter market and, by then, the ownership by McDonough of 70% of the stock, claim the marketplace was no longer "a fair reflection of the judgment of the buying and selling public” as to Endicott common. (Matter of Deutschmann [Amer. Tel. & Tel. Co.], 281 App Div 14, 19.)
Under the circumstances, the weight of market value, whether great or small or none, was for the fact-finding tribunals, and there is no reason to disturb the Appellate Division’s conclusion, on the facts and in its discretion, that in this case the appraiser was not required to rely "to any large degree” on the market value of Endicott’s common stock.
Important policy considerations are behind New York’s support of the appraisal approach, with the limitation of the role of market value to that of a variable component. Not the least of these are the stimulation of corporate incentive to minimize dissent by seeking the best possible deals and the protection of investors whose expectations do not center on the market. (Eisenberg, The Legal Roles of Shareholders and Management in Modern Corporate Decisionmaking, 57 Cal L *590 Rev 1, 72-74, 84-86; Folk, De Facto Mergers in Delaware, 49 Va L Rev 1261, 1293. For a contrary view see Manning, The Shareholder’s Appraisal Remedy: An Essay for Frank Coker, 72 Yale LJ 223, 228-229, 260-261.)
In addition, the right of dissenting stockholders to obtain fair value rather than market value for their stock protects them from being forced to sell at unfair values arbitrarily and unilaterally fixed by those who may dominate a corporation. The obligation to accept fair value is an accepted risk of public stock ownership for, in some instances, market price at the time of a merger may have been pushed to levels in excess of fair value, and the automatic right to it in a valuation proceeding could bring a windfall. Either way, market price is but an ingredient that must enter into the calculation for what it is worth, no more and no less. (Matter of Fulton, 257 NY 487, 493-494, supra).
We turn now to the matter of "negative good will”, which represented $2.98 of the appraised figure of $45.75. The Appellate Division, finding it duplicative, struck it from the appraisal, thus reducing the stock valuation to $42.77 per share.
According to accepted accounting principles, the amount of depreciation of a company’s assets is determined on the basis of historical cost. But historical "cost” to an acquiring company of the assets it has acquired from a second company cannot exceed the amount paid by the purchaser for that stock. The difference is said to result in "negative good will”, which may be described as the amount by which the book value of an acquired company’s assets exceeds the amount paid for its stock by an acquiring company, the situation which both parties agree prevailed in the present case. As a result, while Endicott continued to charge its own earnings with depreciation based on its own historical cost, Mc-Donough, in charging its consolidated earnings with depreciation of the Endicott assets based on its lower historical cost to it, was left with a compensating negative good will for amortization into its consolidated earnings over the years. Thus, Endicott contends that the appraiser, in adding back some or all of this discount by an allowance for negative good will in the evaluation of the stock, ignored the very shortcomings which gave rise to the discount in the first place.
The stockholders, on the other hand, claim that McDonough will profit by obtaining a larger tax-free yearly increment to income than is represented by any corresponding loss of *591 depreciation that will occur as an offset by reason of a reduction of Endicott’s assets, partly because of the difference in the depreciation schedules available to Endicott and McDonough. These are, however, postmergér.
We hold that, in the context of this case, where detailed consideration was otherwise given to the value of matters like investment credit, tax-loss carry forward and, especially, depreciation, we cannot say that the Appellate Division was not within its province in deciding that the negative good will was not an element of special value that added anything to what had already been encompassed by the investment value considerations that preponderated in the evaluation of this stock.
Nor can we say that the lower courts were not justified in regarding the separate elements of worth the appraiser ascribed to the depreciation, tax-loss carry forward and investment credit items as but particularizations of a conscientious, step-by-step analysis of relevant income account factors rather than as added aliquot valuations.
As to its increase of the counsel fees, in the light of the result achieved, the time spent at the case, and the fact that, as the representatives of the largest number of shares in the proceeding, they appear to have had the laboring oar of acting as lead counsel, this was within the Appellate Division’s exercise of its discretion. (See Matter of Spatt, 32 NY2d 778; Cohen and Karger, Powers of the New York Court of Appeals, op. cit., at p 589.)
Accordingly, the order should be affirmed.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones and Wachtler concur; Judge Cooke taking no part.
Order affirmed, without costs.