Edward A. FORD, III, Robert L. Hiller, William B. Meares, Donald H. Bowen, and Norman T. Kinzie, Appellants and Cross-Appellees,

v.

COURIER–JOURNAL JOB PRINTING COMPANY, Appellee and Cross-Appellant.

Court of Appeals of Kentucky.

June 18, 1982.

Supreme Court Order Denying Discretionary Review Oct. 6, 1982.

Ralston W. Steenrod, Octavia B. Wilkins, John A. Bartlett, Louisville, for appellants and cross-appellees.

Charles H. Zimmerman, Jr., John G. Treitz, Jr., Greenebaum, Treitz & Maggiolo, Louisville, for appellees and cross-appellants.

Before GANT, HOGGE and WINTER-SHEIMER, JJ.

GANT, Judge.

Appellee, Courier-Journal Job Printing Company (which is not affiliated with or related to the newspaper) is a 100-year-old producer of lithographic and letter press materials, specializing in liquor labels, books and journal job printing. In 1977 and 1978, the company had received several offers for the purchase of its stock, at least three of which were from E. A. Ford, III, one of the appellants herein, who was at that time in management of the company. After rejecting previous offers, in 1978 the company began negotiations with Stevens Graphics, Inc., for a sale of many of the assets and of

the business of the Company. In November of that year, the president and chairman of the board of the Company sent notice to all shareholders of a special stockholders' meeting, to be held on December 21, 1978, the principal purpose of which was to approve and authorize the sale to Stevens, which notice included a nine-page memorandum outlining the proposed terms.

At the shareholders' meeting, the sale was approved by an overwhelming majority. The appellants herein voted their 4.9% of the Company's shares against the sale, as did the executors of an estate, not parties to this appeal, who owned 7.9% of the outstanding stock. On December 27, 1978, appellants formally elected to proceed as dissenting stockholders under the provisions of KRS 271A.405 and, through their attorney and in compliance with that statute, demanded payment of the fair value of their shares as of the statutory date, that date being December 20, 1978, the day before the vote approving the sale was taken.

After receiving the notice of dissent, the Company requested an appraisal from First Kentucky Investment Advisors, which fixed the fair value at $96.70 a share as of the statutory date. The Company sent a copy of this appraisal and a written offer for this amount to the appellants. In March, 1979, the appellants were offered the same redemption plan as all other shareholders, which plan ultimately resulted in the payment of approximately $150 per share after many months. These offers were rejected and the Company then filed this action pursuant to the statute on April 6, 1979, asking the Jefferson Circuit Court to determine the fair value of appellants' shares as of December 20, 1978.

It probably should be noted at this point that a wide and deep chasm lay between the sale of certain assets to Stevens and the value of the stock on the statutory date. In the Stevens sale, the Company retained certain assets, of a value of over $1 million, the exact price for the assets sold being predicated on certain pre-tax earnings for an ensuing period, together with other contingencies. The value of the stock on the day prior to the sale would, of course, include the retained assets; would not have any relationship to the earnings of the company in the ensuing 14 months, and would not contain the contingencies set out in the sale to Stevens.

After the issues in this action were joined, appellants commenced a thorough process of discovery, receiving two large volumes of requested information from the appellee, which volumes contained 52 separate exhibits, including audited balance sheets, sales agreements between the Company and Stevens, consulting the employment agreements with officers, lists of encumbrances, correspondence, appraisals, dividend records, retirements plans, leases, etc. Additionally, depositions were taken and, on August 24, 1979, appellants moved for the appointment of an appraiser "to receive evidence on and recommend to the court ... the fair value ..." of their stock. They further requested an appraiser for certain retained real estate, but the court was advised that the real estate was being sold and thus an appraiser was not appointed for the real estate.

Following the sale of the real estate, the Company made a second offer to the appellants for their stock. The original offer of $96.70 per share was increased to $131.00 per share, with each party to pay his own attorney's fees to date and his own share of the cost. This offer was rejected by the appellants.

On April 28, 1980, pursuant to KRS 271A.405(7), and further pursuant to the request of the parties, the court appointed two appraisers who had been recommended by the parties. These appraisers were General Dillman A. Rash and E. Halsey Sandford, Jr., both with impeccable credentials and with a background of education and experience totally qualifying them as financial analysts, eminently capable of evaluating the stock.

The appraisal process then began. The appraisers were furnished with all information they requested, copies being furnished to opposing counsel. The appraisers requested and were granted interviews with

the Company officers, at which interviews counsel for both appellants and appellee were present. Attorneys for each side were given opportunity to furnish any arguments or documentation in support of their position. The Company delivered a ten-page memorandum, together with 54 exhibits, and the appellants declined, reserving their presentation for the court. On August 12, 1980, the appraisers submitted their appraisal to the court, reflecting that the fair value of the common stock was $124.00 per share. This appraisal report was some 15 pages in length, with five pages of appended exhibits. The factors considered by the appraisers were set out in their report, as follows:

> In the course of our analysis, we considered a number of factors including: the nature of the business and its history; the economic outlook in general and for the industry; the apparent objectives of management shareholders; the financial condition of the business including intangible assets, contingent liabilities and capital position; the earning and dividend paying capacity of the Company; the public market prices of comparable companies as related to several key ratios; underlying net asset value; other transactions in C-J Job Printing stock and the nature of its market; the Stevens Graphics proposal and other offers to purchase all of the operating assets and liabilities of the company; and contemporaneous transactions in the private placement and acquisition marketplace. We also drew upon our own experience in pricing and negotiating merger and acquisition transactions, in planning and effecting corporate liquidations and in structuring business proposals acceptable to corporate and individual investors under a variety of market conditions.

Appellants and appellee agree that the law concerning the appraisal of fair value of the stock of dissenting stockholders is as succinctly stated in the case of *In Re Valuation of Common Stock of Libby, Etc.,* Me., 406 A.2d 54, 60 (1979). That case states that the consensus among jurisdictions with statutes patterned after the Model Business Corporation Act, § 81, which Act was the basis of KRS 271A.405, is that three elements or approaches must be *considered,* and that the weight to be given to each element depends on the circumstances of each individual case. These elements are (1) the market value approach; (2) the earnings or investment approach; and (3) the net asset approach. *See also Moore v. New Ammest, Inc.,* 6 Kan.App.2d 461, 630 P.2d 167 (1981).

The paragraph above quoted from the appraisal report clearly indicates that the appraisers complied with the mandate that all elements be considered. The ensuing pages of the report further indicate compliance with this mandate.

The appraisers first considered the market value of the stock, reflecting that the shares were closely held and not actively traded in the market. The report reflects that 2,622 shares of stock in the Company had changed hands in 1978 at $70.00 per share, and 340 shares in the same year at $65.00 a share. It further reflects that in 1976 and 1977 100 shares had been traded at prices between $40.00 and $45.00 per share, for an average during these preceding three years of $68.55 per share. Because these transactions "were infrequent, not current and involved officers of the Company," the appraisers proceeded to other means of evaluation.

The report next reflects on the earnings or investment approach, and, after applying various factors and formulae, concluded that the per-share value, based upon earnings and if publicly traded, would be $85.00 per share. However, since the Company was not a public company but privately held, the appraisers continued to the net asset value approach to evaluation.

After a careful examination of the total assets, and even a consideration of the Stevens sale, which occurred after the statutory date of December 20, 1978, the appraisers arrived at a net asset value of $165.00 a share. They then applied what they termed a "marketability discount" in the following language:

The final step is to address the question of marketability. C-J Job Printing is not a public company and a closely held stock is considerably less attractive to an investor than a similar stock with access to the public marketplace. This difference is normally expressed in terms of a marketability discount applied to its "if-public" price. These discounts, in general, range between 20 and 50 per cent and reflect both the nature of the public market (which was generally unreceptive to new issues at the valuation date) and the characteristics of the subject company (in this case a small regional business with no express desire to go public).

\*     \*     \*     \*     \*     \*

Considering these factors and focusing on these risks, we have selected an over-all discount of 25 per cent as appropriate in this case. Applying a discount of 25 per cent to the $165 underlying net asset value of C-J Job Printing, its value was, thus, $124 per share at December 20, 1978.

After exceptions were filed and overruled, the lower court adopted the appraisal report in its entirety, and this appeal and cross-appeal result.

## VALUATION

Basically, the appellants argue that they should receive the full $165 per share resulting from the net asset approach, without the marketability discount. Appellee contends that the appraisal report should have used the earnings or investment approach, fixing the value of the shares at $85 each. It is our opinion that both the appellants and appellee are wrong, and we affirm the lower court on the question of valuation.

■ This being a case of first impression, it is our opinion and holding that in all appraisals or valuations of fair value of stock, pursuant to KRS 271A.405, the three elements to be considered in computation of the fair value of the shares owned by dissenting stockholders are market value, investment or earnings value, and net asset value. As stated in *In Re . . . Libby, supra,* at p. 60:

All three components of "fair value" may not influence the result in every valuation proceeding, yet all three should be considered. "Compelling the consideration of all of them, including those which may turn out to be unreliable in a particular case, has the salutary effect of assuring more complete justification . . . of the conclusion . . . reach[ed]." Citing *Endicott Johnson Corp. v. Bade,* 37 N.Y.2d 585, 588, 376 N.Y.S.2d 103, 338 N.E.2d 614, 616 (1975).

■ The appraisal report herein clearly shows "consideration" of all component elements, viz., market value, earnings or investment value, and net asset value. The "marketability discount" referred to by the appraisers and complained of by the appellants merely indicates that the appraisers gave some weight to the market value of the stock in computing the fair value thereof, which they are free to do. The appraiser in *In Re Libby, supra,* fixed a percentage value to each of the components, assigning 40 per cent to market value, 40 per cent to investment value, and 20 per cent to net asset value. The price of $124 per share herein might well have been fixed by assignment of a 57 per cent figure to the net asset value and 43 per cent to the market value; or the appraisers might well have assigned a 55 per cent value to the net asset, 25 per cent to market value, and 20 per cent to investment value. However, as stated in *Libby,* these cases do not lend themselves to a strict mathematical formula.

The 25 per cent reduction in net asset value based on marketability was not an arbitrary or clearly erroneous figure. The appraisers noted in their report that in sales of some eight publicly held corporations there was an average of 24.2 per cent in discount from net asset value in similar sales.

Nor do we feel that the discount herein was applied merely because of the minority position of the appellants. The report indicates that the "minority interest" would be

a consideration in discarding the "earnings related approach" as unsound, but that the discount applied to the net asset approach was an "over-all" or a "marketability discount," not a "minority" discount.

## ADDITIONAL DISCOVERY AND PROOF

■ Appellants complained that they were denied equal opportunity to discover and furnish information to the appraisers. Actually, their complaint is that they were denied discovery *after* the appraisal report was filed. The record is clear that during the research, study and interviews by the appraisers, the appellants were given ample opportunity to present any information they desired. They attended, representatively, all interviews and were furnished copies of all documents, including those about which they sought to depose the accountants after the report. In fact, on one occasion they demurred on furnishing argument or documents, choosing to reserve such arguments to be presented before the lower court. The denial of additional discovery after the filing of the report was clearly within the sound discretion of the trial judge, and we must respect his decision thereon. *Naive v. Jones,* Ky., 353 S.W.2d 365, 367 (1961).

## INTEREST

■ Finally, appellants argue that the award of interest of eight per cent was not fair and equitable under the circumstances. In essence, appellants urge this Court to adopt the "cost of money" approach utilized by the Delaware courts. That approach would fix the interest rate at the rate required of the corporation should it be compelled to borrow an amount equal to the value of the appellants' shares for a short to medium term. We are not prepared to adopt such an approach in this case, although if it is utilized by a lower court under proper circumstances this Court might not reverse.

KRS 271A.405(8) states:

The judgment shall include an allowance for interest at such rate as the court may find to be fair and equitable in all the circumstances, from the date on which the vote was taken on the proposed corporate action to the date of payment.

There was evidence herein that on the sale to Stevens the purchaser would pay nine per cent interest on the purchase price if certain contingencies were met and only six per cent if they were not met. The lower court was familiar with the totality of the circumstances herein and we are not prepared to find that he abused his discretion in fixing the interest at eight per cent.

There being no showing herein that the figure arrived at by the appraisers, after due consideration of all necessary elements or approaches, is arbitrary or capricious, the judgment is affirmed on appeal and cross-appeal.

All Concur.