72 N.Y.2d 465 (1988)
In the Matter of William V. Cawley, Appellant, et al., Petitioner,
v.
SCM Corporation, Respondent.
Court of Appeals of the State of New York.
Argued September 15, 1988.
Decided October 27, 1988.
Michael J. Malone, Battle Fowler and Kathy A. Ahearn for appellant.
Nancy E. Barton for respondent.
Chief Judge WACHTLER and Judges KAYE, ALEXANDER, TITONE and HANCOCK, JR., concur with Judge SIMONS; Judge BELLACOSA dissents and votes to affirm in a separate opinion.
*467 SIMONS, J.
The issues presented in this stock appraisal proceeding under Business Corporation Law § 623 (h) (4) are: (1) whether, in assessing the fair value of SCM Corporation stock, the courts below abused their discretion by disregarding the tax deduction that SCM became entitled to upon the consummation of its merger with HSCM Merger Company, Inc. and, if so, (2) whether the value of this postmerger factor should have been distributed equally among all of SCM's stockholders or solely to those stockholders whose shares were responsible for this tax advantage. We hold dissenting shareholders are entitled to receive fair value for their securities as determined by a consideration of all relevant factors, including the prospective, nonspeculative tax benefits accruing to the acquired corporation from the merger. Furthermore, because each share of stock within a given class must be treated equally, the tax advantages attendant to corporate actions must be distributed proportionately among all shareholders in calculating fair value and the dissenters (in this case petitioner is the only dissenter) given their aliquot share of the benefit. Accordingly, we reverse the Appellate Division order and remit the matter for a hearing.
The present dispute arises out of the March 31, 1986 merger between SCM and HSCM, two New York corporations, whereby SCM became an indirect wholly owned subsidiary of *468 Hanson Trust PLC.[1] SCM is a multinational company engaged in the production of chemicals, coatings and resins, paper products, foods and typewriters whose common stock, prior to the merger, was traded on the New York and Pacific Stock Exchanges. Through its subsidiaries, Hanson renders various services, and manufactures and supplies a diverse line of products, including bricks, building materials, construction equipment, food processing and footwear. Its ordinary shares are traded on the London Stock Exchange.
Hanson began a hostile tender offer for all outstanding shares of SCM common stock (par value $5 per share) on August 26, 1985 by offering $60 per share in cash, over $14 per share higher than the preannouncement market price for SCM's stock. SCM's board of directors had previously recommended that such an offer be rejected as inadequate. On September 3, 1985, SCM announced it had executed a merger agreement with Merrill Lynch Capital Markets, providing for the leveraged buyout of SCM by Merrill Lynch and senior members of SCM's management for $70 per share in cash and subordinated debentures (junk bonds) on a fully diluted basis. SCM's financial advisor, Goldman, Sachs & Company, informed the SCM board that in its opinion this price was fair.
In response to the agreement between SCM and Merrill Lynch, Hanson raised its takeover bid from $60 to $72 per share in cash, conditioned upon SCM's not granting any lock-up devices. SCM and Merrill Lynch, in turn, ended their prior agreement and executed a new one, providing for a leveraged buyout of SCM at $74 per share in cash and junk bonds on a fully diluted basis. Goldman, Sachs & Company approved this price as fair. SCM granted Merrill Lynch an option to purchase two of SCM's "crown jewels", its consumer foods and pigments divisions, for $80 million and $350 million respectively, thereby attempting to discourage Hanson from seeking control of SCM. On October 8, 1985, however, Hanson increased its tender offer price for SCM shares to $75 per share in cash, contingent upon the termination or judicial invalidation of this lock-up option. Following a Federal court order preliminarily enjoining SCM and others from exercising the lock-up option (see, Hanson Trust PLC v ML SCM Acquisition, 781 F.2d 264 [2d Cir]), Hanson completed the first step of the *469 merger by purchasing over 50% of SCM's outstanding shares at the $75 tender offer price. At that time, Hanson having wrested control of SCM's board of directors, SCM and HSCM entered into a merger agreement under which the remaining common stock of SCM including exercised and unexercised stock options, would be purchased at $75 in cash. At a special shareholders' meeting on March 27, 1986, the "squeeze out" merger was approved, effective March 31, 1986. In connection with the merger, Goldman, Sachs & Company again expressed its opinion that the $75 per share price was fair.
At the time of the merger, the sale of shares acquired through the exercise of stock incentive options, referred to as ISO shares, was taxed as follows. If ISO shareholders transferred their securities within one year of the exercise of their incentive stock options (or within two years of the grant of these options), the transaction constituted a "disqualifying disposition" under Federal tax law (see, 26 USC § 421 [a], [b]; § 422A [a] [1]; § 425 [c] [1]). As such, the difference between (1) the exercise price and (2) the lesser of the fair market value on the date of exercise and date of sale was treated as ordinary income to the ISO shareholder, and the remaining profit (if any) was treated as a capital gain (long-term gain if the shares were held more than six months, and short-term gain otherwise (see, 26 USC § 1222; Fed Tax Regs § 1.421-5 [b] [2], [3] [26 CFR]). If ISO shareholders held their stock beyond the holding period, the entire difference between the exercise price and fair market value on the date of sale was taxed more favorably as a long-term capital gain (see, Fed Tax Regs § 1.421-5 [a]). Concomitantly, to the extent ISO shareholders recognized ordinary income because of "disqualifying dispositions", the issuing company was entitled to take a tax deduction in the nature of trade or business expense (26 USC §§ 162, 421 [a], [b]).
At the time of the merger, petitioner Cawley had worked at SCM for 23 years and was its treasurer. He owned 9,539 shares of SCM common stock, 7,000 of which he had bought in January 1986 by exercising his incentive stock options. Cawley rejected the $75-per-share price and commenced this proceeding, alleging the merger's tax consequences made his 7,000 ISO shares worth much more. Cawley pointed out that the Hanson-SCM merger, which, in effect, forced him to sell his stock, entitled SCM to take a $354,437.50 tax deduction for Cawley's ISO shares, and a $3,852,031.77 tax deduction for the remaining ISO shares because the stock was sold before the *470 end of the requisite holding period. Given the 46% corporate tax rate, SCM thus obtained a substantial posttax benefit of $163,041.25 and $1,771,934.60 respectively. Cawley asserts that these tax consequences should have been weighed in assessing fair value; and, specifically, that his ISO shares were worth $43 per share more than SCM's common stock because SCM derived this tax benefit directly and exclusively from the ISO shares. He also asserts, that because he was forced to sell his stock prematurely, his profit from the sale of his ISO shares was subject to tax as ordinary income (not more favorably as capital gains), thereby requiring him to pay $107,100 in excess taxes.[2] Cawley urges that this too should have been considered in valuing his ISO shares. Supreme Court, New York County, dismissed Cawley's petition seeking a determination of the fair value of his shares; the Appellate Division unanimously affirmed, without opinion.
As a threshold issue, we note that a court's appraisal of dissenting shareholders' interests, "to the extent that it is confined to issues of fact, rests largely within the discretion of the lower courts" (Matter of Endicott Johnson Corp. v Bade, 37 N.Y.2d 585, 588 [citing Cohen and Karger, Powers of the New York Court of Appeals § 148, at 589-590 (rev ed)]). Our decision here is confined to whether the courts below abused their discretion in disregarding the tax consequences of the Hanson-SCM merger.
Under the Business Corporation Law, two or more domestic corporations in New York can merge into a single corporation, with one of the constituent corporations surviving (Business Corporation Law § 901 [a] [1]). The board of directors of a corporation that participates in a merger must follow certain procedures in adopting a plan of merger (Business Corporation Law § 902) and in submitting it to the shareholders for their approval by a two-thirds vote (Business Corporation Law § 903). Shareholders who do not assent to the merger have the right to receive payment for the "fair value" of their shares (Business Corporation Law § 910 [a]). The remedy available to those who have perfected their status as dissenting shareholders  through compliance with the various procedures set forth in section 623  is to enforce this right through an appraisal proceeding (Business Corporation Law § 623 [h] [4]). As we *471 noted in Alpert v 28 Williams St. Corp. (63 N.Y.2d 557), this remedial mechanism protects minority shareholders "from being forced to sell at unfair values imposed by those dominating the corporation while allowing the majority to proceed with its desired merger" (id., at 567-568; see also, Matter of Endicott Johnson Corp. v Bade, 37 N.Y.2d 585, 590, supra; Anderson v International Mins. & Chem. Corp., 295 N.Y. 343, 349-350). Where, as here, equitable relief based upon unlawful or fraudulent corporate action is not pursued, the appraisal proceeding is the dissenting shareholders' exclusive remedy (see, Business Corporation Law § 623 [k]; Breed v Barton, 54 N.Y.2d 82, 85-87; cf., Alpert v 28 Williams St. Corp., 63 N.Y.2d 557, 568, supra).
Prior to 1982, Business Corporation Law § 623 (h) (4) prevented courts from considering postmerger factors in assessing "fair value" by expressly excluding from the calculus "appreciation or depreciation directly or indirectly induced by [the] corporate action or its proposal" (L 1982, ch 202, § 9; see, Matter of Endicott Johnson Corp. v Bade, supra, at 587, 590-591). Case law held that fair value was determined by considering, as of the date of merger, net asset value, investment value and market value, and according weight to each as the facts and circumstances of a particular case dictated (Matter of Endicott Johnson Corp. v Bade, supra, at 587; Klurfeld v Equity Enters., 79 AD2d 124, 137). To assure that fair value determinations reflected the business realities of a given corporate action, the Legislature in 1982 amended paragraph (4) of Business Corporation Law § 623 (h) to provide a more expansive and flexible case-by-case approach to the valuation of shares (see, L 1982, ch 202, § 1; Bill Jacket, L 1982, ch 202, at 18-19). In fixing fair value under the statute as amended, courts must examine "the nature of the transaction giving rise to the shareholder's right to receive payment for shares and its effects on the corporation and its shareholders, the concepts and methods then customary in the relevant securities and financial markets for determining fair value of shares of a corporation engaging in a similar transaction under comparable circumstances and all other relevant factors" (Business Corporation Law § 623 [h] [4] [emphasis added]). By including the phrase "all other relevant factors" and deleting the phrase "excluding any appreciation or depreciation directly or indirectly induced by such corporate action or its proposal", the Legislature evinced its intent that postmerger factors enter valuation computations (see, Bill Jacket, L 1982, *472 ch 202, at 20; cf., Business Corporation Law § 1118 [fair value of interest in a close corporation excludes any element of value arising from the filing of the judicial dissolution petition under Business Corporation Law § 1104-a]). However, in amending section 623 (h) (4), the Legislature was not encouraging the abandonment of the three basic methods of valuation delineated in Endicott. Rather, it intended courts to supplement these approaches by also considering "[e]lements of future value arising from the accomplishment or expectation of the merger which are known or susceptible of proof as of the date of the merger and not the product of speculation" (Alpert v 28 Williams St. Corp., 63 NY2d, at 571, supra; see, Weinberger v UOP, Inc., 457 A2d 701, 713 [Del]).
Here, pursuant to CPLR 409 (b), Supreme Court made a summary determination, based upon the parties' submissions, that no issue of fact existed regarding the fairness of the $75 price per share, basing its conclusion on the recommendations of SCM's financial experts, the active bidding contest between Hanson and Merrill Lynch centering on a price in the low 70's, and the trading history of the stock in the years immediately prior to the merger. The factors discussed by Supreme Court were plainly significant. The letter from Goldman, Sachs & Company demonstrated that the $75 figure was comparable to an amount that would have been set by arm's length negotiations (see, Alpert v 28 Williams St. Corp., 63 N.Y.2d 557, 572, supra) while the other two factors were an excellent indication of the market value for SCM stock on the day the merger was approved (see, Matter of Behrens, 61 NYS2d 179, 183, affd without opn 271 App Div 1007). In that SCM and Cawley contest only the relevancy of the tax consequences of the merger, it is law of the case that the $75-per-share figure is otherwise a fair amount (see, e.g., Martin v City of Cohoes, 37 N.Y.2d 162, 165-166). Accordingly, we reach only the questions whether the tax deductibility of ISO shares was improperly disregarded and, if so, how an aliquot valuation of this tax benefit should be accomplished upon remittal.
Citing Matter of Endicott Johnson Corp. v Bade (37 N.Y.2d 585, 587, supra), Supreme Court stated that the tax consequences of the acquisition were a postmerger factor not subject to valuation. Business Corporation Law § 623 (h) (4), enacted after our decision in Endicott, authorizes courts to consider and accord weight to relevant postmerger factors, *473 however, including the prospective tax benefits of a given transaction. Thus, the court should have addressed the tax benefits from the transfer of ISO shares. The deduction for acquisition of the ISO shares was, as the dissent concedes, a corporate asset of SCM, admittedly susceptible to precise calculation before the merger, that represented value to SCM and arose from the accomplishment of the merger. However, the record is silent on whether the tax deductibility of ISO shares was considered in arriving at the $75-per-share figure (cf., Matter of Endicott Johnson Corp. v Bade, 37 N.Y.2d 585, 591, supra). In fact, SCM's director of taxes, William V. Meltzer, averred that "this future tax benefit * * * is not properly considered an element of fair value", indicating the tax deductibility of ISO shares was not considered at all. Upon remittal, Supreme Court should determine, among other things, whether the $75-per-share figure included consideration of the tax deductibility of ISO shares.
The next issue raised is whether the value of the tax deduction should be spread among ISO shareholders, their securities solely being responsible for the tax advantage, or should be spread equally among all shareholders of SCM common stock. Business Corporation Law § 623 does not resolve this question. On the one hand, section 623 (g) promotes uniformity of treatment by requiring the surviving corporation of a merger to offer to pay all dissenting shareholders of the same class the same price per share when that corporation makes its fair value offer. On the other hand, in support of Cawley's position, this subdivision allows a corporation and an individual dissenting shareholder to agree upon a price for his or her shares after the former has made its fair value offer. This conflict is resolved, however, by Business Corporation Law § 501 (c) which provides that "[s]ubject to the designations, relative rights, preferences and limitations applicable to separate series, each share shall be equal to every other share of the same class." Because the record indicates ISO shares were identical in all respects to SCM common stock held by the investment public, section 501 (c) mandates that ISO shareholders be treated no differently from other SCM common stockholders (see also, Fe Bland v Two Trees Mgt. Co., 66 N.Y.2d 556, 568-569). Thus, if Supreme Court concludes that the $75 price per share did not include consideration of the deductibility of ISO shares, the tax benefits that accrued to SCM are to be spread among all of its common stockholders, *474 for calculation purposes, and petitioner is to be awarded his proportionate share of this corporate asset.[3]
Finally, petitioner contends that his personal income tax situation should have been considered. However, personal income tax liability is not an element of future value to SCM arising from the merger (Alpert v 28 Williams St. Corp., 63 N.Y.2d 557, 571, supra; see, Weinberger v UOP, Inc., 457 A2d 701, 713 [Del], supra). As the Supreme Court of Delaware stated in defining fair price: "The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern. By value of the stockholder's proportionate interest in the corporate enterprise is meant the true or intrinsic value of his stock which has been taken by the merger" (457 A2d, supra, at 713 [quoting Tri-Continental Corp. v Battye, 31 Del Ch 523, 74 A2d 71, 72]). Manifestly, Cawley's $107,100 increased tax liability had no bearing on the value of SCM's common stock and thus was properly disregarded below.
The dissenter questions the "purpose to be served" by this decision. He concedes, however, that the tax benefit respondent corporation derived from repurchasing ISO shares constituted a corporate asset. Indeed it did. Because of the tax treatment of respondent's cost of repurchasing the ISO shares, the corporation was entitled to a deduction of more than four million dollars and a tax benefit of almost two million dollars. Petitioner contends that the statute contemplates that the fair value of his shares should reflect this corporate asset and that courts below erred interpreting the 1982 statute and a decision of this court superseded by the 1982 amendment when they failed to consider it. Although the dissenter would ignore this claim as merely an attempt to "sweeten" a "windfall",[4] we *475 believe petitioner's proceeding represents an appropriate request for judicial intervention to resolve a legal question of importance to New York's business community. The dollar benefit to petitioner in the end, may be relatively small or even nonexistent, but that fact does not reflect the importance of the underlying statutory question presented by the case and could not justify our failure to answer it.
Nor have we, by our decision, unduly complicated these proceedings. Nothing in the statute or its legislative history supports the dissenter's claim that the Legislature, in amending section 623, was concerned with a need to make the statutory remedy "fast and summary". On the contrary, section 623 (h) gives the court plenary powers to adjudicate fair value issues (para [3]) and gives the parties broad pretrial disclosure rights to assist them in the presentation of their claims (para [4]). We assume jury trials are not permitted in these proceedings because corporate matters are traditionally equitable in nature and because difficult and technical valuation problems are commonly addressed by the court without a jury.
Accordingly, the order of the Appellate Division should be reversed and the matter remitted to Supreme Court to determine whether a summary determination was appropriate, and to reassess the fair value of SCM's stock, in light of this decision.
BELLACOSA, J. (dissenting).
I dissent and vote to affirm the order of the Appellate Division which affirmed the judgment of Supreme Court fixing the fair value of petitioner Cawley's stock at $75 per share. My particular disagreement with the reversal is that it effects as a matter of law an asset-specific accounting in what is supposed to be simply a fair value appraisal of a minority shareholder's stock. It would then necessitate a pro rata calculation of this minuscule asset relative to the 22,000 other shareholders.
The legal issue that separates us in this complex billion dollar corporate-financial merger is narrow. Did both lower courts correctly apply the fair value appraisal criteria of Business Corporation Law § 623 (h) (4), or must a sui generis tax factor of the kind implicated in this case be expressly *476 considered? I would say "yes" to the first question and "no" to the second.
My difficulty is discerning a sufficient legal basis to disturb as a matter of law the lower courts' determinations. Moreover, on a practical basis, there is no manifestation on the record and no purpose to be served in concluding that the Appellate Division did not weigh all the "relevant factors" in arriving at its fair value determination under the statute.
Cawley was the treasurer of SCM at the time that Hanson Trust PLC initiated its two-step merger acquisition of SCM (see, Alpert v 28 Williams St. Corp., 63 N.Y.2d 557, 563; Brudney & Chirelstein, A Restatement of Corporate Freezeouts, 87 Yale LJ 1354, 1356, 1358 [1978]). At the time of the merger, Cawley owned 9,539 shares of SCM common stock. All Cawley's stock was purchased pursuant to incentive stock options ("an option granted to an individual for any reason connected with his employment by a corporation", Internal Revenue Code § 422A [b] [26 USC]). Seven thousand of his shares were acquired five months after the initiation of the takeover, three months before Hanson sought to freeze out minority shareholders, and two days after Hanson acquired greater than a 50% controlling interest in SCM. There is no difference in class or in character between Cawley's common stock and the over 12 million other outstanding shares of SCM common stock. The factors which Cawley parlays into a personal enhancement of his valuation treatment are the manner in which he purchased the shares and the tax consequences that emerged solely from the timing of his liquidation of his common stock.
An employer is not entitled to a trade or business expense deduction (Internal Revenue Code § 162 [26 USC]) for employee profit realized from an incentive stock option if the employee holds the shares for more than one year from the exercise of the option and more than two years from the grant of the option (Internal Revenue Code § 421 [a]; § 422A [a] [26 USC]). If the time periods are not satisfied, the employer becomes entitled to a tax deduction equal to the ordinary income compensation realized by the employee (Internal Revenue Code § 421 [b] [26 USC]; Fed Tax Regs § 1.421-5 [b] [3]; [e] [26 CFR]). By reason of forced buyout of 7,000 shares of Cawley's common stock before he had held them for a year, Hanson-SCM acquired a pro rata tax deduction. That is the nub of this case.
*477 As the sole remaining dissenting shareholder in this appraisal action, Cawley, through careful crafting of his legal argument, argued that the fair value of his common stock is greater than the fair value of all other stock in his class because of the tax deduction which inured to the acquiring corporation. The majority acknowledges that Cawley does not otherwise contest the $75 common stock fair value determination, calling it "law of the case" (majority opn, at 472). There is no dispute that the SCM's independent financial advisor, Goldman, Sachs & Company, advised the SCM board of directors that the common stock offerings at $70, $74 and, finally, $75 all represented fair value offers. In fact, the tender offer price of $75 per share was $29 per share more than the pretakeover announcement market price. The record reveals not a hint of contradiction of Hanson-SCM's cogent argument before the Trial Justice that its $75 freeze-out offer was fair value because it far exceeded the market value of the stock preceding the active bidding contest, that the offer exceeded the investment value of the stock, and that net value is not an appropriate measure of fair value of an ongoing concern (record on appeal, at 40-42).
Cawley was recipient of a most generous special stock preference (option price of $21 for 5,000 shares and $32.12 for remaining 2,000) owing to his status as an insider corporate treasurer (indeed a fully informed senior management officer). He was afforded in the midst of a corporate takeover battle a guaranteed substantial profit at 350% (the option price was $53 below market price on the day he exercised it and his over-all buyout from the corporation was characterized by the trial court as a "golden parachute"). He now argues that the successor to his benefactor, Hanson-SCM, should not incidentally benefit from the tax deduction accruing as a consequence of his special treatment, and that the fair value of his common stock should be different from the $75 uncontested "law of the case", appraiser certified, common stock fair value, and should be sweetened by the value of the corporate deduction. Business Corporation Law § 623 gives dissenting minority shareholders like Cawley a fair value appraisal remedy, not the equivalent of an accounting and a windfall to boot.
The implementation of an appraisal proceeding requires that "shares of the same class be equal in all respects to every other share of the class" (Fe Bland v Two Trees Mgt. Co., 66 N.Y.2d 556, 569; see, Katzowitz v Sidler, 24 N.Y.2d 512, 518). *478 Business Corporation Law § 623 (h) (4) provides that in appraising stock value of a dissenting shareholder, "the court shall consider the nature of the transaction giving rise to the shareholder's right to receive payment for shares and its effects on the corporation and its shareholders, the concepts and methods then customary in the relevant securities and financial markets for determining fair value of shares of a corporation engaging in a similar transaction under comparable circumstances and all other relevant factors." "[I]t is well established by case law that, in our State, the elements which are to enter into such an appraisal are net asset value, investment value and market value * * * [but] the weight to be accorded to each varies with the facts and circumstances in a particular case" (Matter of Endicott Johnson Corp. v Bade, 37 N.Y.2d 585, 587 [citations omitted]).
No rigid rule exists for determining the fair value because the appraisal will necessarily have to be flexible to the "existence of a state of facts peculiar to the situation" (Matter of Fulton, 257 N.Y. 487, 494). "It follows that all three [appraisal methods] do not have to influence the result in every valuation proceeding. It suffices if they are all considered" (Matter of Endicott Johnson Corp. v Bade, 37 N.Y.2d 585, 588, supra). Additionally, "[e]vidence that an independent investment firm was retained to render a fairness opinion on the price offered to the minority" is one means of demonstrating the price was proper (see, Alpert v 28 Williams St. Corp., 63 N.Y.2d 557, 572, supra). "The ultimate valuation to the extent that it is confined to the issues of fact, rests largely within the discretion of the lower courts" (Matter of Endicott Johnson Corp. v Bade, supra, at 588, citing Cohen and Karger, Powers of the New York Court of Appeals § 148, at 589-590 [rev ed]).
The record here amply demonstrates that the trial court was cognizant of the fact that the tender offers made throughout these takeover proceedings far exceeded the market value of the stock prior to the initiation of the buyout. The court also had Hanson-SCM's uncontested arguments before it regarding the investment and net asset value of the stock. Heavy reliance was placed on the fair value appraisals of the independent financial advisors Goldman, Sachs & Company. It is of no legal consequence that the Trial Justice refused to engage in tax asset accounting, because there is no error in discounting such tax consequences as "particularizations of a conscientious step-by-step analysis of relevant income account factors rather than as added aliquot valuations" (Matter of Endicott Johnson Corp. v Bade, 37 N.Y.2d 585, 591, supra). *479 The tax consequences of Cawley's option exercise and freeze-out-compelled distribution, together with those of the two other senior executive officers privileged to own incentive stock option shares, were among the myriad of factors that produced a merger price of $75 per share, which was by all accounts fair and generous as far as Cawley was concerned. By this analysis, I do not propose that the courts "ignore" or "refuse" to answer the key question; rather I say the lower courts have answered it  correctly for the parties and for New York's business community.
Alternatively, even if we were to assume, however, that the tax factor is a mandatory relevant factor under the Business Corporation Law § 623 "catch all"  cogent legislative history and close analysis of the law and evidence here suggest that is not necessarily so  and even if we were to assume further that the lower courts did not consider that factor at all, I still arrive at the same result. A remittal for what is likely to be a relatively fruitless exercise should produce no or de minimis effects in this case. The tax asset acquired by Hanson-SCM from the buyout of Cawley's stock must be given specific recognition under the majority's holding and must be spread equally among all common stock shareholders. This would result in an increase in value of 1.3 cents per share ($163,041 ÷ 12,172,340 shares = 1.3 cents [this calculation is made, of course, on the only shares for which appraisal is sought  Cawley's  and will no doubt be the subject of proof by the contending accountants at the trial]). The holding that the corporate tax benefits, derived from the freeze out of all incentive stock option shares, be accounted for and then calculated pro rata as among all of SCM's former shareholders with Cawley being awarded his proportionate share grants relief never requested by Cawley and also necessarily deals with the fair value of common stock of nondissenting shareholders. This was not within the purview of Cawley's Business Corporation Law § 623 fair value proceeding and functionally grants a kind of class action relief.
Only Cawley's shares (7,000 out of 12 million) are really involved, and not all stock and shareholders, as is required, are really affected by Cawley's "red herring", "relevant" factor. Individualization of this kind of tax consideration could not have realistically been intended by the Legislature and it seems to me may be fraught with mischief and impracticality. The holding in this case may flip like proceedings into full *480 scale accountings, with all the delay, uncertainty and speculation of such matters (see, Johnson v Manhattan & Bronx Surface Tr. Operating Auth., 71 N.Y.2d 198; Matter of Lanzano v City of New York, 71 N.Y.2d 208). The Business Corporation Law § 623 remedy is supposed to be relatively fast and summary, which is why jury trial is forbidden. That procedural goal will be negated or at least frustrated by the interpretation given the statute in this case as applied to the numerous vexatious cases sure to be generated.
I agree with the majority that Cawley is not entitled to an increase in the fair value of his common stock equal to the difference between the ordinary income tax treatment of the profits from his stock and the capital gains treatment he would have received had he held the stock for more than the six-month capital gains period.
Both irrelevant tax factors were correctly excluded or discounted from this fair value determination by the courts below, and I would affirm.
Order reversed, with costs, and matter remitted to Supreme Court, New York County, for further proceedings in accordance with the opinion herein.
NOTES
[1] HSCM Merger Co., Inc., was an indirect wholly owned subsidiary corporation of Hanson Trust PLC and was a corporate shell used by Hanson to facilitate the merger with SCM.
[2] Individual income derived as capital gains is now taxed at the same rate as ordinary income (see, 26 USC former § 1202, repealed by Pub L 99-514, tit III, § 301 [a], 99 US Stat 2216).
[3] The relief granted is consistent with the relief demanded in petitioner's pleading although the incremental increase in the value of petitioner's shares after a new hearing may be less than petitioner requests. That is not a determination to be made by this court, however, and the speculative computation of the increase and its amount, recited in the dissent, is unsupported by evidence in the record or statements in the briefs.

Finally, in answer to the dissent, this proceeding is not in any sense a class action or the functional equivalent of a class action. Petitioner was the only shareholder to perfect his right to a fair valuation determination, as provided by statute, and thus he will be the only shareholder entitled to a value greater than $75 if the court finds the shares have a greater value after considering the tax benefit to the corporation.
[4] We would note that the exercise of stock options, earned long before merger was contemplated, and the valuation of shares purchased under them, has nothing to do with "golden parachutes" and the trial court did not so characterize this transaction.